Jacob L. MOLINAS, Plaintiff,

v.

NATIONAL BASKETBALL ASSOCIATION, Maurice Podoloff, Boston Celtics Basketball Club, Inc., Zollner Machine Works, Inc., Minneapolis Basketball, Inc., Madison Square Garden Corp., Inc., Philadelphia Arena, Inc., Syracuse Professional Basketball Club, Inc., Milwaukee Hawks, Inc., Cincinnati Royals Basketball Club, Inc., Defendants.

United States District Court
S. D. New York.
Jan. 11, 1961.

Joel H. Weinberg, New York City, for plaintiff; Abraham L. Shapiro, New York City, of counsel.

Colton, Gallantz & Fernbach, New York City, for defendants, The Nat. Basketball Assn. and Maurice Podoloff. George G. Gallantz and Stuart D. Wechsler, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Plaintiff, Jack Molinas, is a well-known basketball player. In 1953, upon his graduation from Columbia University he was "drafted" by the Fort Wayne Pistons, then a member of the defendant National Basketball Association (now the Detroit Pistons). Subsequently, in the fall of 1953, he signed a contract to play with the Pistons. In January of 1954, however, he admitted, in writing, that he placed several bets on his team, the Pistons, to win. The procedure he followed was that he contacted a person in New York by telephone, who informed him of the "point spread" on the particular game in question. The plaintiff would then decide whether or not to place a bet on the game. The plaintiff admitted that he received some $400 as a result of these wagers, including reimbursement of his telephone calls to New York. After the plaintiff admitted this wagering, Mr. Podoloff, the president of the league, acting pursuant to a clause (Section 15) in plaintiff's contract and a league rule (Section 79 of the League Constitution) prohibiting gambling, indefinitely suspended the plaintiff from the league. This suspension has continued until the present date. Since the suspension, plaintiff has made several applications, both oral and written for reinstatement. All of these have been refused, and Mr. Podoloff has testified that he will never allow the plaintiff to re-enter the league. He has characterized the plaintiff as a "cancer on the league" which must be excised.

In the meantime, plaintiff attended and graduated from the Brooklyn Law School, and was then admitted to the New York State Bar. He has also been playing basketball for Williamsport and Hazelton of the Eastern Basketball League.

In 1954, shortly after the suspension, plaintiff brought an action in the New York State Supreme Court, alleging that he had been denied notice and hearing prior to the suspension, and that there was no authority for the indefinite suspension imposed by Mr. Podoloff. The court, after a trial, found against the plaintiff, holding that since he had engaged in reprehensible and morally dishonest conduct, he was not entitled to seek the aid of an equity court. The court also found that even if a hearing was required by league rules, it would have been a futile formality in this case, since the plaintiff had admitted violations of his contract and the league rules. An appeal was taken to the Appellate Division but was subsequently dismissed.

In the action presently before the court, the plaintiff alleges that the defendant National Basketball Association has entered into a conspiracy with its member teams and others in restraint of trade, and thus has violated the anti-trust laws. It is alleged that the operation of the so-called reserve clause, by which players are allocated among the

league teams, and through which a team holding a player's contract is given an option to renew it each year, is an unreasonable restraint of trade in violation of the anti-trust laws. It is further alleged that the suspension of the plaintiff by the league, and its subsequent refusal to reinstate him, is the result of a conspiracy in violation of these laws. Finally, plaintiff charges that the league has, through this conspiracy, imposed certain collateral restraints upon him, affecting his opportunities to play in "exhibition games" against league personnel.

Plaintiff seeks treble damages in the sum of three million dollars, an injunction against the conspiracies alleged, and reinstatement to the league.

■ It is well established that the plaintiff has the burden of proving, by a preponderance of the evidence, that there has been a violation of the anti-trust laws which has injured him. This burden clearly has not been met in the instant case. Plaintiff has not established any violation of the anti-trust laws which has in any way injured him, and thus his complaint must be dismissed.

■■ The law is clear that, in order for a private plaintiff in a civil anti-trust suit to recover, he must establish a clear causal connection between the violation alleged and the injuries allegedly suffered. See, e. g. Royster Drive-In Theatres, Inc. v. American Broadcasting Paramount Theatres, Inc., 2 Cir., 1959, 268 F.2d 246, certiorari denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121; Tepler v. Frick, 2 Cir., 1953, 204 F.2d 506; E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc., 9 Cir., 1958, 252 F.2d 473, certiorari denied 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844. With respect to the plaintiff's contention based on the so-called reserve clause, no causal connection whatsoever has been established between the reserve clause and any damage which he may have sustained. Plaintiff has not shown that he suffered any damage at the time he signed his contract with the Fort Wayne Pistons, in the fall of 1953, following the so-called college draft. It does not appear that Molinas was in any way displeased over playing for the Pistons, and were it not for his suspension in January of 1954, it is likely that he would have continued to play for them without complaint. Following the suspension, the refusal of the league or its member clubs to deal with the plaintiff was clearly due to the suspension, rather than the reserve clause. These teams would obviously have refused to deal with the plaintiff even if the reserve clause had never existed. Thus, the plaintiff has not sustained his burden of proof on this claim.

■■ In addition, it seems that the claim based on the reserve clause is barred by the statute of limitations. Even if the plaintiff's theory of a continuing conspiracy is accepted arguendo, the statute of limitations begins to run from the date of the last overt act in furtherance of that conspiracy. See Steiner v. 20th Century Fox Film Corp., 9 Cir., 1956, 232 F.2d 190; Erone Corp. v. Skouras Theatres Corp., D.C.S.D.N.Y. 1957, 166 F.Supp. 621. In the present case, certainly no act subsequent to 1953 causing damage to the plaintiff, involving the operation of the reserve clause, has been shown. Thus, the statutory period of four years has run. For these reasons, it is unecessary for me to reach the question as to whether the reserve clause, as it operates in the National Basketball Association constitutes an unreasonable restraint of trade in violation of the anti-trust laws.

■ With respect to plaintiff's suspension from the league in January of 1954, and the subsequent refusal by the league to reinstate him, plaintiff has patently failed to establish an unreasonable restraint of trade within the meaning of the anti-trust laws. A rule, and a corresponding contract clause, providing for the suspension of those who place wagers on games in which they are participating seems not only reasonable, but necessary for the survival of the league. Every league or association must have

some reasonable governing rules, and these rules must necessarily include disciplinary provisions. Surely, every disciplinary rule which a league may invoke, although by its nature it may involve some sort of a restraint, does not run afoul of the anti-trust laws. And, a disciplinary rule invoked against gambling seems about as reasonable a rule as could be imagined. Furthermore, the application of the rule to the plaintiff's conduct is also eminently reasonable. Plaintiff was wagering on games in which he was to play, and some of these bets were made on the basis of a "point spread" system. Plaintiff insists that since he bet only on his own team to win, his conduct, while admittedly improper, was not immoral. But I do not find this distinction to be a meaningful one in the context of the present case. The vice inherent in the plaintiff's conduct is that each time he either placed a bet or refused to place a bet, this operated inevitably to inform bookmakers of an insider's opinion as to the adequacy or inadequacy of the point-spread or his team's ability to win. Thus, for example, when he chose to place a bet, this would indicate to the bookmakers that a member of the Fort Wayne team believed that his team would exceed its expected performance. Similarly, when he chose not to bet, bookmakers thus would be informed of his opinion that the Pistons would not perform according to expectations. It is certainly reasonable for the league and Mr. Podoloff to conclude that this conduct could not be tolerated and must, therefore, be eliminated. The reasonableness of the league's action is apparent in view of the fact that, at that time, the confidence of the public in basketball had been shattered, due to a series of gambling incidents. Thus, it was absolutely necessary for the sport to exhume gambling from its midst for all times in order to survive.

The same factors justifying the suspension also serve to justify the subsequent refusal to reinstate. The league could reasonably conclude that in order to effectuate its important and legitimate policies against gambling, and to restore and maintain the confidence of the public vital to its existence, it was necessary to enforce its rules strictly, and to apply the most stringent sanctions. One can certainly understand the reluctance to permit an admitted gambler to return to the league, and again to participate in championship games, especially in light of the aura and stigma of gambling which has clouded the sports world in the past few years. Viewed in this context, it can be seen that the league was justified in determining that it was absolutely necessary to avoid even the slightest connection with gambling, gamblers, and those who had done business with gamblers, in the future. In addition, conduct reasonable in its inception certainly does not become unreasonable through the mere passage of time, especially when the same factors making the conduct reasonable in the first instance, are still present. At any rate, plaintiff must show much more than he has here in order to compel a conclusion that the defendant's conduct was in fact unreasonable. Thus, it is clear, that the refusal to reinstate the plaintiff does not rise to the stature of a violation of the anti-trust laws.

With respect to the alleged "collateral restraints"—those involving various exhibition games in which league teams or players allegedly refused to play because of the plaintiff's presence—the plaintiff has completely failed to establish that any of these alleged incidents was the result of any conspiracy involving the league or its president, Mr. Podoloff. Once again, it must be remembered that the plaintiff has the burden of proof, and it is clear that there is a complete failure of proof on this issue. It was not established that the league or Mr. Podoloff, gave any instructions whatsoever concerning these matters, or that any agreement or conspiracy was ever entered into. The proof established at most that several league owners, coaches or players may have felt that it was unwise, possibly because of the like-

lihood of adverse publicity, to participate in a game, in which the plaintiff, an admitted gambler, was also involved. This falls far short of the conspiracy required to establish a violation of the anti-trust laws.

Thus it is apparent that the plaintiff has not presented sufficient proof to make out a claim upon which relief may be granted. In the view which I take of the case, it is not necessary to deal with the contention of the defendant based on the alleged general release, or that premised on the doctrine of collateral estoppel. Plaintiff's complaint, therefore, must be dismissed.

The foregoing opinion will constitute the court's findings of fact and conclusions of law.