Nedrick YOUNG et al., Plaintiffs,

v.

MOTION PICTURE ASSOCIATION OF AMERICA, INC., et al., Defendants.

Civ. A. No. 4189-60.

United States District Court District of Columbia.

June 12, 1961.

Dickstein & Shapiro, James M. Earnest, Washington, D. C., Margolis & McTernan, and A. L. Wirin, Los Angeles, Cal., for plaintiffs.

Royall, Koegel & Rogers, Washington, D. C., for defendants.

LEONARD P. WALSH, District Judge.

This matter comes before the Court on the Plaintiffs' motion under Rule 30(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to preclude inquiry as to the Plaintiffs' political associations or beliefs, past or present, on depositions

by oral examination which Defendants have served notice they intend to take pursuant to the Federal Rules. Plaintiffs, except Robert L. Richards, indicate that any inquiry relating to their political associations and beliefs will result in an invocation of their constitutional privilege under the First Amendment and their privilege against self-incrimination under the Fifth Amendment. Plaintiffs, except Robert L. Richards, also state that if the Court directs them to answer such questions in depositions, they will persist in their refusal and the Court may take such action as it deems proper under Rule 37(b) (2) of the Federal Rules without first requiring Defendants to apply for an order under Rule 37.

Basically, the Plaintiffs' ground for their instant motion is to the effect that an inquiry into their political associations and beliefs is proscribed by the Anti-Trust Laws and is irrelevant to the subject matter of this action.

Plaintiffs identify themselves as eight screen writers and four actors, and indicate also that they sue in their own behalf as well as on behalf of others similarly situated. Defendants are motion picture producers and distributors and their trade associations.

The Un-American Activities Committee, originally known as the Dies Committee, was established by the House of Representatives in 1938.[1] This Committee has consistently investigated Communist activities in this country as they affected certain segments of the community, and in 1947 the Committee announced, and set out upon a wide range program of investigation, and more particularly an investigation of Communist influences in Hollywood.[2] As Defendants state, in October of 1947 persons who came to be referred to as the "Hollywood Ten", screen writers, directors, or actors, refused to testify before the

1. H.Res. 282, 75th Cong., 3rd Sess., 83 Cong.Rec. 7568, 7586.

2. Report of the Committee on Un-American Activities to the United States House of Representatives, 80th Cong., 2nd Sess., Dec. 31, 1948, 2–3 (Committee Print).

House Un-American Activities Committee as to whether or not they were members of the Communist party, and as a result of that refusal they were indicted and sentenced to terms of imprisonment. Four of the so-called "Hollywood Ten" are Plaintiffs in this action.[3]

The complaint alleges that since November 25, 1947, and continuously thereafter up to and including the date of filing the complaint, the Defendants and their co-conspirators combined and conspired among each other in violation of the anti-trust laws (15 U.S.C.A. §§ 1, 2); that Defendants circularized and published throughout the motion picture industry a "blacklist" containing the names of persons, among them the Plaintiffs, who were accused of Communist membership or affiliation, or affiliation with other subversive organizations or activities; that Defendants concertedly refused to utilize the services or talents of the Plaintiffs or other "blacklisted" persons; that Defendants refused to distribute, etc., motion pictures utilizing the services of the Plaintiffs and other "blacklistees;" that Defendants concertedly refused to utilize the services of the Plaintiffs and others except on a "black market" at greatly reduced prices; and that Defendants maintained an industry-wide clearance program which permitted the services and/or work product of only those persons who passed clearance to sell in a free market.

With respect to this clearance program, Plaintiffs allege that on November 3, 1960, the Defendants concertedly agreed that they would individually maintain a clearance program such that a determination as to whether or not a particular person was or was not a Communist would be the responsibility of each Defendant.[4]

Plaintiffs also contend that such agreement is *per se* illegal under the Sherman Act.

Defendants meanwhile contend that the Plaintiffs' motion is premature at this point in the proceedings, and further, that an inquiry into the political beliefs, affiliations and associations of Plaintiffs is relevant to the action before the Court.

The Court would observe initially that there is in this case a need to balance the private and public interests, just as there is in cases involving testimony before Congressional Committees where the claim of privilege or self-incrimination is made by one called to testify. Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115.[5] In this case, even on the motion involving as it does a procedural question, the

---

3. Plaintiffs Biberman, Cole, Lawson and Maltz.

4. A letter from Eric Johnston, President, Motion Picture Association of America, Inc., dated November 4, 1960, states:

"The consensus of the meeting on November 3, 1960, was that the policy of the MPAA member companies in regard to the hiring of communists in the creation of motion pictures was the following:

"1. No company will knowingly employ a communist; and

"2. Each company has the responsibility to determine for itself whether any person it employs is a communist.

"This policy applies to pictures made by member companies and to pictures financed or co-produced by member companies in association with others for distribution by member companies. The member companies will ask their associates to adhere to this policy."

5. The Barenblatt opinion, 360 U.S. at page 126, 79 S.Ct. at page 1093, states:

"Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown."

It may well be that with respect to a motion to preclude inquiry such as that of Plaintiffs here the Court would be premature in ruling on the matter at this posture of the case because the particular circumstances of the matter would be more clearly shown at the time of the taking of the deposition and speculation as to what the particular circumstances of the matter would be at the time would be avoided.

Court must balance the private right, the right to work, of people in the labor force with the immediate countervailing private right of employers and industry to control any subversive Communist element in the motion picture industry which may adversely affect their investment. Also, there is the immediate but no less major interest of the public, the interest in national self-preservation, which the Communists and Communistic movement seek to undermine by the use of Un-American propaganda and activities in attacking the principles of the form of government as guaranteed by our Constitution.[6]

The Court cannot treat the claim of the Plaintiffs here with respect to their "political associations or beliefs, past or present" as though these associations and beliefs were the tenets of, and sponsored by a peaceable political party (reform or otherwise) as we have come to know them in our society.[7] The suggestion and allegation of a subversive Communist element strongly dictates that it is a "particular circumstance" of the case, and any balancing of interests to be performed by the Court should await not only the commencement of oral examination, but rather the completion of such examination uninterrupted by motions to compel answers so that the Court may rule on the matter not on an *ad hoc* question by question basis as was ob-

jected to by Judge Dimock in the case of Independent Productions Corporation et al. v. Loew's Incorporated et al., D.C. S.D.N.Y.1961, 27 F.R.D. 426, but rather, at least, on the basis of the entire examination of one witness.

As noted, the Plaintiffs allege that the November 3, 1960 agreement entered into by the Defendants was *per se* unlawful under the Sherman Act. However, the Court would not make such a determination, and especially not at this juncture of the case, without further facts before it. It may be and the facts may so reveal, as the Defendants suggest, that the action taken by them is the independent exercise of business judgment based on Communist connections of the Plaintiffs with the aims of (1) controlling the possible subversive Communist propaganda that the hiring of Communist Party members might introduce to the movie-going public, and (2) protecting their investment in the motion picture business from poor attendance or boycotting by the theater-going public because of the employment therein of suspected members of the Communist Party. It is noted the Supreme Court in the Barenblatt case found the Congressional Committee's investigation was aimed not at controlling what was being taught at universities but at controlling the overthrow of our form of government. Only a more thorough ex-

---

6. Hearing before House Committee on Un-American Activities, Communist Methods of Infiltration (Education), 83rd Cong., 1st Sess. (1953), pp. 1–3.

7. Judge Learned Hand's opinion in the case of United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, as it related to the aims, etc., of the Communist Party of the United States, is referred to with approval in the Barenblatt case, 360 U.S. at pages 128, 129, 79 S.Ct. at page 1094. "* * * This Court in its constitutional adjudications has consistently refused to view the Communist Party as an ordinary political party, and has upheld federal legislation aimed at the Communist problem which in a different context would certainly have raised constitutional issues of the gravest character * * *. To suggest that because

the Communist Party may also sponsor peaceable political reforms the constitutional issues before us should now be judged as if that Party were just an ordinary political party from the standpoint of national security is to ask this Court to blind itself to world affairs which have determined the whole course of our national policy since the close of World War II, affairs to which Judge Learned Hand gave vivid expression in United States v. Dennis, * * * and to the vast burdens which these conditions have entailed for the entire Nation."

See also a Report of American Bar Association, Special Committee on Communist Tactics, Strategy, and Objectives, inserted in the Congressional Record on August 22, 1958, 85th Congress, 2nd Sess., by Hon. Styles Bridges.

ploration of the facts here will permit a determination of whether there was in fact a conspiracy on the part of the Defendants violative of the antitrust laws, or whether the Defendants' action was the independent exercise of business judgment with the aims outlined above. At this posture of the case, however, the Court cannot find, as the Plaintiffs would have it find, that the agreement of the Defendants here constituted a *per se* violation of the antitrust laws.

A plain reading of the letter of November 4, 1960, the so-called tangible work product of the meeting of the Defendants on November 3, 1960, does not in the eyes of the Court constitute a *per se* violation of the antitrust laws. The letter itself is couched in terms of independent action, based on broad policy considerations on which the Defendants apparently agreed, rather than in terms of concerted action of "blacklisting", etc. The letter also speaks of not employing "communists" without attempting to define the term, and this in itself tends to suggest that independent action will be exercised for the term is sufficiently nebulous as to permit of several interpretations without a prescribed definition. Chaffee, The Blessings of Liberty, (1956).

As claimed by the Defendants, a fuller presentation of the facts in this case may indicate their actions do not constitute a conspiracy to restrain trade in violation of the antitrust laws, but their agreement was reasonable in view of the fact that the confidence of the public in the motion picture industry had been placed in question as a result of the Congressional investigations of the industry with respect to Communist infiltration therein and the consequent influence that Communists could wield and appeared to be

wielding. It may well be that here, as in the case of Molinas v. National Basketball Association, D.C.S.D.N.Y.1961, 190 F.Supp. 241, where a player involved in basketball scandals alleged that he was being denied the right to his professional livelihood by way of a conspiracy among the basketball league members, there is a necessity to exhume insofar as possible any taint or stigma of Communist workmanship on the motion pictures, etc., produced.

The Defendants cite the case of Independent Productions Corp. v. Loew's, Incorporated, D.C.S.D.N.Y.1958, 22 F.R.D. 266 as being closely analogous to the situation confronting the Court here. Loew's was a treble damage suit filed by two corporate plaintiffs against corporate and individual defendants engaged in the movie industry, alleging defendants conspired to prevent and interfere with the distribution and exhibition of the film "Salt of the Earth" produced and distributed by the two plaintiff corporations. The purported president of the plaintiff corporations (Mr. Lazarus) refused to answer questions relating to his possible connections and beliefs of a subversive character, i. e., Communist Party participation. Judge Herlands of the District Court held questions in this area to be relevant, and granted the defendants' motion to compel answers thereto, and denied plaintiffs' cross motion to preclude the defendants from further inquiry into the area.[8] The case was appealed on the basis of a dismissal order after an order to show cause why witness Herbert Biberman (not the president, but an agent) alleged to be the corporation's managing agent, should not be compelled to answer certain questions on which he asserted his constitutional privilege of self-incrimination. On remand, the defendants sought an order, under

8. Judge Herland's opinion, 22 F.R.D. at page 279:
"So far as concerns matters other than the listed questions actually propounded to Mr. Lazarus, plaintiffs' motion to limit the scope of defendants' examination [F.R.Civ.P. Rule 30(b)] is premature. Any claim of privilege or irrelevancy should be raised by plaintiffs' objection to specific questions when asked. The Court will not, in advance, pass upon anticipated questions [citations]."

Rule 37(a) of the F.R.Civ.P., directing plaintiffs, by one Herbert Biberman, to answer certain questions put to him on examination before trial after he refused assigning as one ground his privilege against self-incrimination. Plaintiffs in this case cite Judge Dimock's opinion, supra, in that latest hearing as being ruling in this case.[9]

In the majority of cases where exclusion of specific questions or matters from the scope of oral depositions has been sought, the motion has been denied, although the courts have pointed out in some instances that certain matters, even though permitted on oral examination, might be objected to at trial. 4 Moore's Federal Practice, p. 2031 (2nd Ed., 1950), Annotation, 70 A.L.R.2d 742; and the opinion of Judge Keech of this Court in Continental Distilling Corporation v. Humphrey, D.C.1955, 17 F.R.D. 237. Of course, Judge Dimock's opinion in the Loew's case was rendered at a different posture of the proceedings than the motion submitted here. Even so, Judge Dimock clearly seems to take the position that the court is in a better position to rule, and the parties are often saved much expense, if the oral deposition is taken in its entirety with exceptions and objections noted, and any motion to com-

pel answer filed úpon the termination of the taking of the deposition. Further, Judge Dimock had the record of the prior proceeding to guide him.

█ For this court to grant the plaintiffs' motion here would place it in the position of passing on questions of relevancy in advance. Under the circumstances of this case, the Court does not consider that to be advisable, and considers this motion to be premature. It will be noted that in the Loew's case, 22 F.R.D. at page 270, the oral examination of Lazarus, the alleged president of the plaintiffs, involved questions which Lazarus answered on deposition and which he had refused to answer when he appeared before the House Committee on Un-American Activities.

Plaintiffs here are asking the Court to speculate as to questions which the Defendants will ask, how the questions will be phrased, what questions the Plaintiffs will answer, if any, how they will be answered, and what form the claim of privilege the refusal of the Plaintiffs will take, if in fact they refuse to answer certain questions put to them by the Defendants.

The Court also does not foreclose the possibility that any motion of the De-

9. Judge Dimock's opinion, at page 429 of 27 F.R.D.:

"The questions which the witness refused to answer were those directed toward proof that defendants' refusals to deal with plaintiffs did not evidence an antitrust conspiracy on their part, but resulted rather from an independent exercise of business judgment by each defendant based on the Communist connections of plaintiffs and their consequent undesirability as associates for persons to whom good public relations were important. I am willing to accept the proposition that proof of that kind is essential to defendants' case. I cannot, however, accept the proposition that it is not available except in the mouth of the witness Biberman. Indeed evidence of general repute of Communist association would be more valuable than even an admission by the witness of such association.

"Defendants have, therefore, failed to make out a case of essential and elsewhere unobtainable testimony refusal to give which would be ground for dismissal of plaintiffs' case. Defendants' motion for an order directing plaintiffs to cause the witness to answer the questions will have to be denied since such an order would be futile.

"The question remains whether I ought to direct that the examination of Biberman proceed, and, if so, under what conditions."

Though lamenting the fact that the oral deposition was not completed and the motion to compel answer filed subsequent thereto, Judge Dimock directed the examination to continue as to those questions to which Biberman did not claim privilege and directed that certain costs be paid by defendants.

fendants to compel answer by the Plaintiffs may await their option, if in fact occasion therefor at any time arises, to exhaust the collection of evidence of general repute of Communist association, through such other means as they have at their disposal. If the filing of such a motion were forestalled until that time, a court would not have to speculate, as did Judge Dimock, as to whether evidence of general repute of Communist association was available, and to what extent, elsewhere other than through the testimony of the particular witness.

It is noted by the Court that this entire cause of action is based on Communistic or subversive activities in that the conspiracy alleged by the Plaintiffs, that is the agreement between the Defendants, came into being as a result of the suggestion of Plaintiffs' association or affiliation with, or membership in, the Communist Party.

The motion of the Plaintiffs under Rule 30(b), to preclude inquiry into certain matters on oral examination, is therefore denied, and counsel for Defendants will prepare an appropriate order consistent with this opinion.