**LONG ISLAND LIGHTING COM-
PANY, Plaintiff,**

v.

**STANDARD OIL COMPANY OF CAL-
IFORNIA et al., Defendants.**

**CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Plaintiff,**

v.

**STANDARD OIL COMPANY OF CALI-
FORNIA et al., Defendants.**

**Nos. 74 Civ. 2233, 74 Civ. 2645.**

United States District Court,
S. D. New York.

Feb. 27, 1975.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for plaintiffs; Asa D. Sokolow, David W. Cohen, Naomi G. Litvin, Joseph Leibowitz, Kenneth F. McCallion, Charles A. Soberman, Karen Weiner, New York City, of counsel.

Lord, Day & Lord, New York City, for defendants Standard Oil Co. of Cal. and Chevron Oil Trading Co.; Gordon B. Spivack, John W. Castles, 3d, Harry G. Sklarsky, Thomas D. Brislin, David Marks, New York City, Pillsbury, Madison & Sutro, San Francisco, Cal., Turner H. McBaine, Wallace L. Kaapcke, Thomas E. Haven, San Francisco, Cal., of counsel.

Charles F. Kazlauskas, Jr., and Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Texaco, Inc.; G. Kenneth Handley, Milton J. Schubin, Milton Handler, Daniel Lazaroff, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Mobil Oil Corp., Sanford M. Litvack, James A. Magee, Benjamin Vinar, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant Texaco Overseas Petroleum Co.; Robert B. von Mehren, Irwin J. Sugarman, New York City, of counsel.

WYATT, District Judge.

This is a motion by all defendants to dismiss the first and second claims of the complaint in the first action (74 Civ. 2233) and the first claim of the complaint in the second action (74 Civ. 2645). Fed.R.Civ.P. 12(b)(6).

These are two separate civil actions, separately commenced. Plaintiff in the first action is Long Island Lighting Company (Lilco). Plaintiff in the second action is Consolidated Edison Company of New York (Con Ed). The five defendants in each action are the same. They are three major oil companies—Standard Oil Company of California (SOCal), Texaco, Inc. (Texaco), and Mobil Oil Corporation (Mobil)—and a subsidiary of SOCal and a subsidiary of Texaco. For simplicity, the two subsidiaries will be disregarded and included in any mention of SOCal and Texaco.

These two actions were consolidated by order filed August 23, 1974. In the federal courts, consolidation does not destroy the separate character of the actions. There may be consolidated discovery procedures and there may be a joint trial of the two actions but each action preserves its separate identity. Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933); Zdanok v. Glidden Co., 327 F. 2d 944, 950 n.6 (2d Cir. 1964); McAlister v. Guterma, 263 F.2d 65, 68–69 (2d Cir. 1958); Greenberg v. Giannini, 140 F.2d 550 (2d Cir. 1944) (L. Hand, C. J.); Abrams v. Occidental Petroleum Corp., 44 F.R.D. 543, 547 (S.D.N.Y. 1968).

On the return day of this motion, there were also two other motions, one by SOCal and the other by Mobil. These two other motions were adjourned without date, to permit the present motion to be heard and decided first, before considering the other two motions.

The present motion is directed to the complaint in each of the two actions. The questions raised, however, are the same since the complaints in respect of the claims involved are substantially the same. For simplicity, this opinion will consider only the first claim of the complaint in the Lilco action. The decision as to this claim will necessarily govern as to the second claim of the complaint in the Lilco action and as to the first claim of the complaint in the Con Ed action.

The memorandum for movements refers to a few matters outside the complaint, these apparently not the subject of dispute. Lilco, in opposing the three motions, has submitted extensive affidavits. This procedure was probably followed by counsel for Lilco because one set of papers has been submitted by them, opposing all three motions and on one at least of the other motions an affidavit was submitted by the movant. In any event, the decision of the present motion is based solely on the complaint. Affidavits have been excluded and not considered. Fed.R.Civ.P. 12(b).

The First Claim of the Complaint in the Lilco Action (numbers in parentheses refer to paragraph numbers of the complaint)

The claim arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). Jurisdiction is laid under 28 U.S.C. § 1337 and appears to exist.

Lilco is an electric utility serving customers on Long Island (3). It needs each year about 7½ million barrels of low sulphur oil, out of an annual requirement of about 21 million barrels of oil of all types. (24)

For some years, New England Petroleum Corporation (Nepco) has been the sole supplier of oil to Lilco (25). Nepco is one of the largest "independent" importers, refiners, and distributors of oil. (14)

SOCal and Texaco in the early 1960's found in Libya (a sovereign state) a "substantial quantity" of low sulphur crude oil. They produced this crude oil in Libya through a jointly owned corporation (Amoseas). SOCal made a long term agreement with Nepco under which SOCal agreed to supply Nepco with substantially all of the share of SOCal of the output of Amoseas in Libya. This crude oil was to be delivered by SOCal to a refinery in the Bahamas (Borco). Borco was owned 65% by Nepco and 35% by SOCal. The effect of the Nepco-SOCal agreement was to make Libya the major source of low sulphur oil for the East Coast of the United States (10, 12, 27)

There is an agreement between Nepco and Lilco under which Nepco is obligated until March 31, 1980, to supply Lilco with all its requirements of low sulphur oil. The price to Lilco is determined by reference to a published cargo price per barrel, but the agreement "established certain maximum prices". (25, 26)

The general conclusory averment, meaningless except as supported by fact averments, is that defendants and others have conspired to and have monopolized trade in low sulphur oil to be imported into the East Coast of the United States. "A major objective of the conspiracy was and is to protect the monopoly interests of the defendants and others in the Persian Gulf area." No other objective of the conspiracy is averred. Specifically, there is no claim that injury to Lilco was an objective of the conspiracy. Indeed, there was no competition between Lilco and defendants nor did Lilco buy any oil from defendants. There is an averment that defendants knew that the carrying out of the conspiracy would "materially damage" Lilco. (22)

The "Organization of Petroleum Exporting Countries" (OPEC) is made up of all major oil producing countries. The "London Policy Group" (LPG) is made up of most free world oil companies, including defendants, and was apparently formed to bargain with OPEC.

(16, 28) There are a number of averments as to LPG activity but, while evidence as to this might be admissible if there were a trial, they seem to add nothing to the claims of activity by defendants themselves and for present purposes may be disregarded.

In 1972 defendants reached agreement with a number of Persian Gulf oil exporting countries, including an agreement whereby Saudi Arabia secured a 25% participation in a corporation (Aramco) theretofore owned entirely by defendants and another oil company. Aramco produces crude oil in Saudi Arabia. (11, 29)

In August 1973 a number of smaller oil companies made agreements with Libya under which 51% of the oil produced by them in Libya would belong to Libya, 49% would belong to the companies, and the companies had the right to buy from Libya most or all of its 51% of the oil. (30)

Libya offered the same agreement to defendants but they "concertedly" rejected this offer. The reason was that acceptance would have "jeopardized" the "more valuable holdings" of defendants in the Persian Gulf area. (31) Presumably the reasoning of defendants was that if they agreed with Libya on a 51% participation, then Saudi Arabia and the other Persian Gulf countries would want the same percentage or at least more then the 25% participation which had been negotiated.

The Libyan Government then nationalized a 51% interest in Amoseas, the producer in Libya jointly owned by SOCal and Texaco. (33)

SOCal then suspended all deliveries to Nepco of Libyan crude oil. (34) Nepco protested that this was a breach of contract but SOCal "stood firm", its motive being to protect the Persian Gulf interests. (35)

Nepco then made an agreement with Libya under which Nepco bought from Libya about the same amount of crude oil "that SOCal previously had been supplying". Libya, however, raised the

price and Nepco was obliged to pay Libya "substantially higher prices" than it had been paying SOCal. (36; it seems clear that these "higher prices" demanded by Libya are the real and only root of any evil ultimately visited upon Lilco)

After Nepco had made its purchase agreement with Libya, the conspirator defendants attempted to prevent Nepco from buying oil from Libya or from hauling, refining and distributing it to Nepco customers, among which was Lilco. Their attempts included threats and the bringing of "groundless legal actions around the world". (37–45)

Nepco defeated all these attempts by defendants and was able to bring the oil from Libya. Nepco therefore "succeeded in . . . supplying its customers, including Lilco." (46)

Because Nepco was paying higher prices to Libya for low sulphur crude oil, Nepco demanded higher prices from Lilco for low sulphur residual oil (left after refining crude). The "price charged Lilco by Nepco for low sulphur residual oil continued to rise precipitously". (47) Lilco tried to get oil elsewhere but no oil company in the London Policy Group "submitted an offer". (48)

Lilco had to pay higher prices to Nepco for its oil requirements and this is the chief injury here alleged. (49) Other items of damage are also alleged. (50–56) As to the damages from "fuel price increases", Lilco avers that "a portion" of such increases has been passed on by it to its electric customers and that, if Lilco recovers for these increases from defendants, refunds will be made to the customers to the extent the Public Service Commission approves. (55)

As noted before, Lilco had a contract with Nepco which contained price provisions and established maximum prices. Accordingly, Lilco commenced an action for breach of contract against Nepco (the complaint in the action against Nepco bears the same date as the complaint in the case at bar). The action against Nepco was brought in the New York Supreme Court, Nassau County. The complaint avers in substance that the increase by Nepco of its prices to Lilco was in breach of their contract. Damages of $62,000,000 are demanded. The averments of damage in the complaint against Nepco (paragraphs 15–22) are substantially the same as in the complaint at bar (paragraphs 49–54).

There is no averment in the complaint at bar about the commencement of the action against Nepco but, as was recognized at oral argument on this motion, judicial notice thereof may properly be taken since the pleadings in the action against Nepco are "public documents". Zahn v. Transamerica Corp., 162 F.2d 36, 48 fn. 20 (3d Cir. 1947); see also Coman v. Coman, 492 F.2d 273, 276 fn. 5 (3d Cir. 1974); McCormick on Evidence (2d ed.) 766.

1.

Plaintiff is not a competitor of defendants nor has it ever bought any of their products. Plaintiff is a customer of a former customer of one of the defendants. This one defendant did at one time have business transactions with its customer Nepco, to which it sold oil; it had no such transactions with plaintiff.

The complaint charges that violations of the antitrust laws by defendants caused injury to plaintiff. The nature of these violations is difficult to discover from the complaint; in this respect the complaint is most general and conclusory. For present purposes, however, it will be assumed that the complaint is sufficient to charge some kind of antitrust violations.

No anti-competitive conduct of defendants, however, was directed against plaintiff. Nothing of this sort is claimed by plaintiff; the most claimed is that defendants knew that plaintiff was a customer of Nepco, was a large user of oil, and could be injured by price increases, along with all other users of oil.

Whatever the motives of defendants, up to the nationalization by Libya in

September 1973, nothing done by defendants could possibly have affected plaintiff. In this period, the conduct of which plaintiff complains is that defendants concertedly rejected the proposal of Libya for a 51% participation. Libya then took the 51% by force. The result was precisely the same as if defendants had done what the complaint. suggests they should have done, namely, agree to give up the 51%.

After the nationalization by Libya, SOCal, in resisting the "takeover", refused to deliver crude oil to Nepco. If this was wrong to Nepco under its contract with SOCal or otherwise, Nepco had its remedy against SOCal. Certainly the business decision by SOCal was no wrong to plaintiff, which bought no oil from SOCal.

After the nationalization by Libya, the real complaint of plaintiff is that Libya raised the price of oil. If plaintiff is able to recover from Nepco for breach of contract, then plaintiff has sustained no damage. If plaintiff is unable to recover from Nepco, plaintiff asks this Court to require defendants to pay for the oil price increases of Libya. The benefit of these increases went all to Libya; defendants received no part of the increases.

### 2.

The case at bar appears to be ruled by Calderone Enter. Corp. v. United Artists, 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). This Court had dismissed antitrust claims on the face of the complaint (Fed.R.Civ.P. 12(b)(6) ) because plaintiff had no standing to sue. The Court of Appeals affirmed, declaring it to be the law of this Circuit that ". . . in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i.e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued." (454 F.2d at 1295) The earlier decisions are collected in *Calderone*.

■ The complaint shows on its face that if there were a conspiracy to violate the antitrust laws the target was not plaintiff but Libya or the Persian Gulf states or all of them. Plaintiff has no standing to sue.

### 3.

Assuming that Lilco has standing to sue, the complaint shows that it has not been injured "by reason of" any antitrust violations (15 U.S.C. § 4).

■ The principle is that in a civil antitrust action the plaintiff "must establish a clear causal connection between the violation alleged and the injuries allegedly suffered". Molinas v. National Basketball Ass'n, 190 F.Supp. 241, 243 (S.D.N.Y.1961; I. R. Kaufman, D. J.), quoted with approval in Salerno v. American League, 429 F.2d 1003, 1004 (2d Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

■ The complaint makes it clear that the cause of Lilco's injury (if any) was the increase by Nepco of its prices, an increase which Lilco says was an unjustified breach of contract and for which Lilco is suing. If Nepco's price increase was justified under the contract, then the justification was the increase by Libya of the purchase price to Nepco, an increase which was decided upon by Libya, a sovereign state over which defendants have no control. In any event, therefore, no "causal connection", either "clear" or otherwise, is shown between the claimed violations of defendants and the claimed injuries of Lilco.

■ The further principle is that damages in a civil antitrust action are allowed "only to those who have suffered some diminution of their ability to com-

pete", that is to say, "the plaintiff must allege and prove that the illegal restraint of trade injured his *competitive position* in the business in which he is or was engaged". GAF Corp. v. Circle Floor, 463 F.2d 752, 757, 758 (2d Cir. 1972; emphasis in original), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L. Ed.2d 1045 (1973).

There is nothing in the complaint to show that Lilco suffered any competitive disadvantage. No such showing could be made since Lilco does not engage in competition, as its memorandum recognizes (p. 107). It is a regulated monopoly.

The claim that defendants had a monopoly and restrained trade relates to the Persian Gulf area, not to Libya. But there is no claim that anything done in the Persian Gulf area affected Lilco; on the contrary, the memorandum for Lilco seems to recognize that nothing done in the Persian Gulf area had any effect on Lilco except to supply a motive for the alleged activity in Libya.

### 4.

The movants have further arguments based on the act of state doctrine (Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)) and based on the principle that only the first purchaser from an antitrust violator may recover under the antitrust laws (Donson Stores Inc. v. American Bakeries Co., 58 F.R.D. 481 (S.D.N.Y.1973). In view of the conclusions reached, these arguments—while substantial—need not be considered.

The motion is granted. There is an express determination that there is no just reason for delay and an express direction (Fed.R.Civ.P. 54(b)) to the Clerk for the entry of separate judgments dismissing the first and second claims of the complaint in the first action (74 Civ. 2233) and the first claim of the complaint in the second action (74 Civ. 2645) for failure to state a claim upon which relief can be granted.

So ordered.