**AMERICAN FEDERATION OF TELE-
VISION AND RADIO ARTISTS,
AFL–CIO, Plaintiff,**

v.

**NATIONAL ASSOCIATION OF
BROADCASTERS, Defendant.**

No. 73 Civ. 268.

United States District Court,
S. D. New York.

Jan. 12, 1976.

Mortimer Becker, New York City, for plaintiff.

Lee Loevinger, Martin Michaelson, James H. Sneed, Hogan & Hartson, Washington, D. C., Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant.

OPINION

GRIESA, District Judge.

This is an action brought by the American Federation of Television and Radio Artists, AFL–CIO ("AFTRA") against the National Association of Broadcasters ("NAB"). AFTRA brings this action on behalf of fifteen AFTRA members who have appeared as program hosts on television programs directed at children. The complaint alleges that the NAB has combined with its members to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by promulgating a rule which prevents hosts of children's television programs from delivering commercial messages on or adjacent to these programs. In addition the complaint charges that the rule constitutes a deprivation of property without due process of law, in violation of the Fifth Amendment to the United States Constitution. AFTRA seeks injunctive and declaratory relief as well as treble damages.

Both parties have agreed to have the issues in the action determined by the Court on the basis of stipulated facts. For the reasons hereafter set forth, I find in favor of defendant and hold that the complaint should be dismissed.

I.

The NAB is an association of broadcasters organized to promote the interests of owners and operators of commercial radio and television stations and networks throughout the United States. Since 1952 the NAB has continuously promulgated and revised the Television Code of the NAB ("the Code"), setting forth standards for programming and advertising. Subscription to the Code is voluntary and is open to non-members as

well as members of the NAB. Subscribers to the Code are entitled to display a Seal of Good Practice which indicates subscription to the Code.

The NAB has within it certain bodies charged with overseeing compliance with the Code. Certain procedures are established for handling alleged violations. The only sanction imposed by the NAB for Code violation is suspension of the broadcaster's subscription and the right to display the Seal of Good Practice.

All of the national networks are members of the NAB and subscribers to the Code. Of the approximately 700 commercial television stations licensed by the Federal Communications Commission, 500 are members of the NAB, but only 400 stations subscribe to the Code.

The NAB rule attacked in this litigation came about as follows. Over the years a familiar practice in the television industry was to have a host or an actor in a television program deliver the commercials on that program. Strong complaints arose about this practice in connection with children's television programs. It was thought that the delivery of commercials to children by a character on a favorite television program operated as an overly powerful inducement in favor of the product being advertised. It was thought that ethical conduct in the children's programs required a separation between the persons involved in the television program proper and the persons delivering the commercials.

On February 5, 1970 a group known as Action for Children's Television filed a submission with the FCC. This submission urged the adoption of certain rules, including a rule preventing a television performer on a children's television program from delivering commercials on that program. On February 12, 1970 the FCC issued a public notice describing the receipt of the above submission, and stating that before the FCC considered the matter further, interested persons were afforded the opportunity to submit pleadings. On March 30, 1970 the NAB filed a pleading with the FCC opposing

the proposed regulation on the ground that the NAB Code already had certain protective provisions which were sufficient.

On January 26, 1971 the FCC, by public notice, instituted a formal inquiry into children's television programming and advertising practices, and announced that, among other things, the inquiry would deal with the proposed rules recommended by Action for Children's Television.

On February 2, 1971 the chairman of the FCC addressed a meeting of the American Advertising Federation and urged in general terms that the television industry adopt effective self-regulation in respect to children's television programs.

Early in 1971 a group known as The Council on Children, Media and Merchandising developed a code which it hoped would be adopted in the television industry. Part of this proposed code was to the effect that commercials on children's programs would be clearly delineated from the program proper, and that the content and personnel involved in each was to be separate.

On or about March 16, 1971 Senator Frank E. Moss, Chairman of the Subcommittee for Consumers of the Senate Commerce Committee, wrote a letter to the NAB proposing that the NAB consider making its own Code conform to the code proposed by The Council on Children, Media and Merchandising.

On May 1, 1971 the Southern Association on Children Under Six, at its annual conference, endorsed the code proposed by The Council on Children, Media and Merchandising.

The NAB began actively considering changes in its Code in early 1971. On or about November 2, 1971 a representative of the NAB met with FCC officials concerned with children's television advertising and programming. The meeting was requested by these FCC officials. Among the subjects inquired about by the FCC representatives was the use of children's program hosts in delivering

commercials. The stipulated facts in this case state that the FCC representatives indicated that self-regulation by broadcasters on this subject "would constitute a positive response by the television industry to criticism leveled against children's advertising and programming, and would be welcomed by the FCC."

The Rule involved in the present action was adopted by the NAB in January 1972 to take effect January 1, 1973. It is Rule 4 of Article X of the Code, and states:

"4. Children's program hosts or primary cartoon characters shall not be utilized to deliver commercial messages within or adjacent to the programs which feature such hosts or cartoon characters. This provision shall also apply to lead-ins to commercials when such lead-ins contain sell copy or imply endorsement of the product by program host or primary cartoon character."

The present action against the NAB was commenced by AFTRA on January 17, 1973.

On October 31, 1974 the FCC issued the report on its inquiry on children's television which had been commenced on January 26, 1971. The report was made following receipt of extensive written comments and the holding of hearings. The report stated in part:

"The Commission does not believe that the use of a program host, or other program personality, to promote products in the program in which he appears is a practice which is consistent with licensees' obligation to operate in the public interest. . . . In this regard, it should be noted that many stations, in particular NAB *Code* member stations, have already eliminated host selling." 50 F.C.C.2d 1, 16–17 (1975).

## II.

Plaintiff's claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, is basically that the compliance by NAB members with the Code rule in question is an unreasonable restraint upon the ability of hosts and actors in children's television programs to freely obtain employment for the delivery of commercials.

Plaintiff's arguments as to unreasonableness are somewhat difficult to summarize. However, the two principal arguments in this regard appear to be (1) that the NAB rule is unreasonable because it was adopted to prevent government regulation, and as a "sop" to critics; and (2) that the NAB rule is unreasonable because it is not supported by sufficient evidence that the delivery of commercials by program hosts and actors is harmful to children.

 I hold that the rule, and compliance therewith by NAB members, do not involve violation of Section 1 of the Sherman Act. There is not the slightest indication of any anti-competitive purpose in the creation of the rule. There is nothing whatever which could justify the conclusion that the rule stemmed from any motive to benefit one class of performers competitively over another class of performers.

It is clear beyond question that the NAB rule resulted from a bona fide concern on the part of various groups, and the FCC, regarding fair and ethical methods to be used in television advertising directed to children. This concern can hardly be said to be frivolous, regardless of whether there was "scientific" evidence demonstrating actual detriment to children. The FCC report puts the matter in proper perspective as follows:

"On the basis of the information gathered in the course of the Commission's inquiry, it has become apparent that children, especially young children, have considerable difficulty distinguishing commercial matter from program matter. Many of the participants knowledgeable in the areas of child development and child psychology maintained that young children lack the necessary sophistication to appreciate the nature and purpose of advertising. . . . The Commission

recognizes that, as many broadcasters noted, these findings are not conclusive; psychological and behavioral questions can seldom be resolved to the point of mathematical certainty. The evidence confirms, however, what our accumulated knowledge, experience and common sense tell us: that many children do not have the sophistication or experience needed to understand that advertising is not just another form of informational programming." 50 F.C.C.2d 1, 15 (1975).

The NAB rule is a reasonable rule of conduct regarding good practice by its members in the public interest and is not a violation of the antitrust laws. *See Cowen v. New York Stock Exchange,* 371 F.2d 661 (2d Cir. 1967); *Deesen v. Professional Golfers' Ass'n of America,* 358 F.2d 165 (9th Cir. 1966); *Molinas v. National Basketball Ass'n,* 190 F.Supp. 241 (S.D.N.Y.1961).

### III.

The complaint in this action (par. 28) contains an allegation that the enactment and enforcement of the rule in question by the NAB is "in violation of the rights guaranteed by the Fifth Amendment to the United States Constitution." There is no explanation in the complaint as to exactly how there is a violation of the Fifth Amendment—whether there is an alleged denial of procedural due process or a violation of some concept of substantive due process.

Plaintiff has filed two memoranda explaining its legal positions—one dated March 13, 1975 and the other dated April 24, 1975. To the extent that the Fifth Amendment claim is dealt with in these memoranda, the discussion is concerned almost entirely with the question of whether the action of the NAB can be considered governmental action for the sake of applying the Fifth Amendment. However, the question of the nature of the alleged due process violation is passed off with brief mention. Plaintiff simply asks the court to find that the NAB rule is "unreasonable" for the reasons urged in plaintiff's antitrust argu-

ment, and argues that this is a violation of due process (Memorandum of March 13, 1975 p. 66). Plaintiff has provided no authorities or analysis on this point.

Thus plaintiff is making no argument of any failure to observe proper procedures. Plaintiff's claim, to the extent articulated, appears to be that the NAB rule somehow violates substantive due process. This claim must fall as completely unsupported by reason or authority. Consequently, it is not necessary to reach the question of whether the action of the NAB could be considered governmental action for the sake of the application of the Fifth Amendment.

### CONCLUSION

For the foregoing reasons, defendant is entitled to judgment dismissing the complaint.

So ordered.