## B. G. CORPORATION v. WALTER KIDDE & CO., Inc.

### No. 432.

Circuit Court of Appeals, Second Circuit.
July 1, 1935.

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, of counsel), for appellant.

Kenyon & Kenyon, of New York City (Douglas H. Kenyon, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an infringement suit of the usual kind, upon patent No. 1,719,848, issued on July 9, 1929, to George M. Paulson; the invention was for a spark-plug in a gas engine. When such engines are idling, or running at low speeds, if the heat be too readily conducted off through the "sparking-point," the point as it cools will foul, interfering with ignition. On the other hand when the engine is running fast, the point will overheat, due to the more frequent explosions; this causes premature firing—"back-firing"—unless the point can conduct away the heat quickly enough to remain relatively cool. The optimum condition is therefore to retain the heat in the point at low speeds and to get rid of it at high. Paulson's purposes, as declared in the preamble to his specification, were to devise a "shank" or "spindle" which should withstand the "heat and strains" of its position; a "head" which should not "scale," or lose its shape under "combustion conditions," and a "sparking-point * * * resistant to erosion." Moreover, although he later mentions the high conductivity of the "shank" as a desideratum (page 1, lines 10, 43, 44, 80, 85), the heat resistance of the "head" appears only in claim one. There however all the elements are described by their function; the "shank" must be heat conducting; the "head" heat-resisting; "sparking-point," non-erosive. Thus the specifications if followed would certainly secure that flexibility which the plug disclosed in use, whether or not Paulson had fully grasped its operation, as he certainly had not its usefulness.

The issue of infringement is too verbal and too insubstantial to deserve discussion; we need consider only validity. A spark-plug must bring into the explosion chamber the two terminals of an electric current; the spark is the discharge across the gap which separates them. One terminal, usually a piece of wire, is grounded to the outer iron shell of the plug which in turn is suitably connected to a source of current; the other must be insulated from the shell. It is attached to the lower end of a metal "shank," surrounded and insulated from the shell by porcelain, mica, or the like, whose upper end is properly wired back to the same source of current. The "shank" might therefore be no more than an insulated wire running through the plug and into the chamber. However, the art had long since abandoned any such simple device, if indeed it had ever strictly speaking used it; it had been customary to make the "shank" of another metal and of a different calibre from the "point," and at times to enlarge it at the end into a flange. Usually this flange was of a piece with the "shank," but occasionally it was made integral with the "point," as in Rall. No. 1,221,906 (1917). Blattmann, No. 1,105,746 (1914), Standish, No. 1,247,345 (1917), and Rogers, No. 1,516,460 (1924), each showed a covering piece for the end of the "shank," separate from "shank" and "point." In Rogers this was to protect the insulator; in Blattmann it was to prevent injury to the "shank"; in Standish it was a heat-conductor, not a heat resister; and in none is there evidence that it was to be of a different metal. Yet all the metals which Paulson used had been used before in some part of a plug. Nickel was common for the "point"; Rall, supra; Blattmann, supra; manganese nickel, which Paulson especially prescribed was disclosed by Olsen, No. 1,335,793 (1920), Littleton, No. 1,525,453 (1925); and Rohde, No. 1,313,419 (1919). The "shank" and "head," in a single piece, were disclosed as of chromium steel, Paulson's high resistant, by Mason (1922), Brit. Pat. 209,-207; steel "shanks" were very common; Blattmann, supra; Mitchel, No. 1,441,444 (1923); Standish, No. 1,247,345 (1917). Walsh, No. 1,076,535 (1913), specially disclosed a "shank" made of a low grade carbon steel, the very metal chosen by Paulson.

For these reasons the defendant argues that the supposed invention is no more than a substitution of materials familiar

22

to the art in the same uses; an aggregation of which each part performs what it *did* before. We may concede as much arguendo, for the same may be said of every invention. All machines are made up of the same elements; rods, pawls, pitmans, journals, toggles, gears, cams, and the like, all acting their parts as they always do and always must. All compositions are made of the same substances, retaining their fixed chemical properties. But the elements are capable of an infinity of permutations, and the selection of that group which proves serviceable to a given need may require a high degree of originality. It is that act of selection which is the invention; and it must be beyond the capacity of common-place imagination. Often we can truly treat the inquiry as one of fact by observing what went before and what followed. If the combination would have had practical value long before it appeared, if no impediment, technical, or commercial, stood in the way, if during that time others had been at work upon the same subject, and if the invention was at once accepted as an answer to the old need, there is usually just basis for the inference. When such evidence is not at hand, we are forced to fabricate a standard as best we can from our naïve ignorance; but that is so unsatisfactory an expedient that resort to it should be as sparing as possible. In either case, whether we have evidence, or must grope unguided, those putatively objective principles by which it is so often supposed that invention can be detected are illusion, and the product of unconscious equivocation; the inexorable syllogism which appears to compel the conclusion is a sham.

■ In the case at bar it seems to us that the evidence is at hand to show that Paulson's combination was beyond the scope of even the most skilled routineers. The record is peppered with a score of patents upon spark-plugs distributed more or less evenly over more than fifteen years. They show a manifold ingenuity and all sorts of permutations, but not Paulson's; it is uncommon to find so much ingenuity devoted to so small a device. During that time the motor car was being made in prodigious, almost monstrous quantities, millions upon millions; a new discovery which gave its possessor an exploitable advantage was likely to be the source of great wealth; the stimulus to invention was rarely strong. Moreover, nothing stood in the path; the defendant's very argument may be turned against itself; for Paulson's metals were all being used and were all available commercially; yet they did not suggest this combination, which would have been as serviceable at any time as it has been since the patent issued. True, its especial use is for the extremely trying service conditions of the airplane, but extensive exploitation of airplanes, commercial and military, had begun long before 1927, the date of Paulson's application. When his plug did appear it was at once recognized as of great service, and has so far become standard equipment for airplanes that the list of its users is a catalogue of most of the responsible airplane companies, as well as the United States army and navy. Before such an industrial picture it seems to us the extreme of incredulity to hesitate. Monopolies may be undesirable; perhaps they should go only to those distinguished benefactors of mankind who will never claim them, whose creative imagination needs no such goad. That is not the assumption which, for good or bad, underlies our patent law, as has been declared over and over again; it presupposes not genius, only an emergence from the common ruck of men who are content to follow beaten paths and unable to find others. Judged by that standard this combination was surely an invention.

■ It is true that Paulson did not foresee the particular adaptability of his plug to the airplane; indeed, we may assume that he did not even know the especial needs of its engine. Nevertheless he did not shoot in the dark; he laid down with perfect certainty what he wished to accomplish and how; it was to conduct away the heat by his choice of metal for the "shank," to resist its loss by the metal in the "head," to use a metal for the "point" which would stand up. The unsuspected value of this flexibility of heat control contributes to establish his discovery as an invention; he is not charged with a prophetic understanding of the entire field of its usefulness. Westmoreland Specialty Co. v. Hogan, 167 F. 327 (C. C. A. 3); Kennicott Co. v. Holt I. & C. S. Co., 230 F. 157, 161 (C. C. A. 7); Larson v. Crowther, 26 F.(2d) 780, 787, 788 (C. C. A. 8).

Decree affirmed.