The ANSUL COMPANY et al., Plaintiffs-Appellants,

v.

UNIROYAL, INC., Defendant-Appellee.

Nos. 686, 687, Dockets 34876, 34883.

United States Court of Appeals, Second Circuit.

Argued March 30, 1971.

Decided April 29, 1971.

Rehearing Denied July 19, 1971.

John A. Diaz, New York City (Morgan, Finnegan, Durham & Pine, Warren H. Rotert and David H. Pfeffer, New York City, on the brief), for plaintiffs-appellants.

Walter Barthold, New York City (Arthur, Dry, Kalish, Taylor & Wood, Bert J. Lewen, Martin J. Cohen and Steven H. Bazerman, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge:

In this patent case, plaintiffs and defendant both appeal from a judgment en-

tered on December 3, 1969 in the Southern District of New York after two non-jury trials before Judge Mansfield. Plaintiff Ansul sued for a declaratory judgment of invalidity, noninfringement, and unenforceability of defendant Uniroyal's United States Patent No. 2,614,-916 (the "916 patent"). Uniroyal counterclaimed for infringement of the same patent; and Ansul denied such infringement and interposed several affirmative defenses including Uniroyal's misuse of the patent through antitrust violations. The other plaintiffs were originally defendants in other actions for infringement of the same patent brought by Uniroyal in other districts. They intervened in the present action at the request of the trial court which enjoined Uniroyal's prosecution of the other suits against them. Two of those intervening plaintiffs—Daly-Herring and Louisville—joined Ansul in seeking treble damages from Uniroyal for the antitrust violations.

Judge Mansfield's decision on the patent questions, made after the first trial, is reported at 301 F.Supp. 273 (S.D.N.Y. 1969). Of the two claims of the patent in issue, he held claim 1 invalid for obviousness and claim 7 valid and infringed by plaintiffs. After the second trial, Judge Mansfield held, 306 F.Supp. 541 (S.D.N.Y.1969), that defendant Uniroyal had misused the patent through antitrust violations and was therefore barred from enforcing it. However, he dismissed, on varying grounds, the treble-damage claims of all three plaintiffs. We affirm the district court's judgment with the single exception that we allow plaintiff Louisville its treble-damage claim, on the basis of Zenith Radio Corp. v. Hazeltine Research, Inc. 401 U.S. 321, 334–343, 91 S.Ct. 795, 804–808, 28 L.Ed.2d 77 (decided Feb. 24, 1971).

The product involved in this case is an agricultural chemical commonly called "maleic hydrazide" (MH). It was discovered in 1894, but was not considered useful until 1947 when two of Uniroyal's employees found that, mixed with a wetting agent, it could inhibit the growth of certain plants without otherwise harming them. Uniroyal applied for a patent on the product in 1949; and in 1952, the Patent Office issued it patent 916, which expired in October 1969. The two claims of that patent at issue here are claim 1, the composition or product claim which describes the chemical composition itself, and claim 7, the method or use claim which describes how the product can be used to treat certain growing plants so as to alter their growth characteristics.

After Uniroyal's initial discovery of this use for maleic hydrazide, two chemists not connected with Uniroyal found that application of the composition to potatoes and onions prevented sprouting and that its application to tobacco plants prevented the formation of "suckers"— lateral branches which prevent the tobacco leaves from reaching their potential size and quality. The latter is by far the major commercial use of maleic hydrazide. Since the early 1950's Uniroyal has manufactured and sold the product under various names, principally "MH–30," a registered trademark. Until Ansul began making and selling the product in 1968 under the principal designation "Sucker Stuff," Uniroyal had a monopoly under patent 916.

Uniroyal's alleged misuse of its patent was established through evidence of its resale price maintenance program and its territorial restrictions on the resale of the product. Beginning in 1960, Uniroyal sold MH–30 to distributors, who in turn sold it to dealers, who sold it to farmers. Until 1969, Uniroyal published and distributed price lists for MH–30, on which it set forth suggested resale prices for both distributors and dealers. The trial court found that from 1960 through 1963, the defendant on a substantial number of occasions tried to and did enforce its suggested prices through various tactics including actual or threatened refusals to deal and certain policing measures such as tracing the MH–30 through identification on its containers. Although Uniroyal contend-

ed that no such enforcement measures were taken after 1963 and that all the effects of such measures had been dissipated by 1968, when Ansul began to infringe patent 916 by marketing its product, the trial court found to the contrary —that the effects of the price-fixing restraints remained until the patent expired in October 1969. The district court found Uniroyal's conduct to have been a *per se* violation of the Sherman Act and thus to constitute patent misuse barring its recovery for the plaintiffs' infringement.

Moreover, until 1969, Uniroyal assigned a certain geographical sales area to each of its distributors. The district court found that these assignments were understood as restrictions, that Uniroyal enforced them in the same way as it did its suggested resale prices, that these actions also constituted a *per se* violation of the antitrust laws, and that the effects of Uniroyal's restrictive conduct in this regard likewise endured until the patent expired and thus constituted patent misuse barring its recovery.

With respect to the treble-damage claims, Louisville and Daly-Herring— distributors with whom Uniroyal ceased dealing in 1963 and 1965 respectively— contended that they were terminated because they refused to abide by Uniroyal's unlawful restrictions and that they were thus damaged by Uniroyal's antitrust violations. Judge Mansfield rejected Louisville's claim on the basis of the statute of limitations, and Daly-Herring's claim on the basis that it had not met its burden of proving the unlawful reason for its termination. Ansul claimed that it was entitled to treble the expenses incurred by it in defending Uniroyal's suits against it and the various distributors indemnified by it, since those suits were allegedly in furtherance of the unlawful antitrust conspiracy. Judge Mansfield rejected this contention on the ground that Uniroyal instituted those suits in good faith.

With the one exception noted above, we affirm the district court's disposition, substantially for the reasons stated in Judge Mansfield's excellent opinions.

## I. THE VALIDITY OF THE DISPUTED CLAIMS OF THE PATENT.

### A. *Claim 1.*

Under 35 U.S.C. §§ 101 and 103, a claimed invention, in order to be patentable, must be new, useful, and not obvious to those having ordinary skill in the art involved. Judge Mansfield found that claim 1 of patent 916, the composition claim, did not fulfill these requirements.

Claim 1 describes the following composition:

> "1. An agricultural chemical composition comprising material of the group consisting of [maleic hydrazide] and its salts, said composition containing a wetting agent."

Maleic hydrazide was described in the prior art as early as 1894. All that Uniroyal's chemists did in the late 1940's was to add a wetting agent; and according to the district court, wetting agents and their function were known long before that time. The court stated that maleic hydrazide and the wetting agent "were old elements well known to the prior art" and that "in combination, [maleic hydrazide] and a wetting agent each is limited to performing the same function which it always has performed independent of the other"; the wetting agent "does not, however, make the [maleic hydrazide] any more active. Thus it simply performs the same function that it would perform if used with any other chemical in solution." 301 F. Supp. at 282.

The trial court recognized that for a combination of known elements to be a patentable composition, "[t]he conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.

Ed. 162 (1950). See also Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321, 326 (2d Cir. 1968). Here, Judge Mansfield felt, the mixture of maleic hydrazide with a wetting agent, claimed in claim 1, was merely an aggregation of two old substances each performing its separate function, and hence was not patentable as a new product.

Uniroyal's main challenge to the trial court's holding is that although maleic hydrazide was discovered in 1894, no use was suggested until its chemists mixed it with a wetting agent and found a use. This original thought and use, it is claimed, were not obvious under the prior art, as is shown by the fact that no one had found such treatment and use for half a century. Uniroyal seeks to distinguish *A & P* and *Continental Can* on the ground that in those cases the new combinations were indeed "accumulations of old devices" whose individual functions were well-known, whereas here, while the function of a wetting agent was known, the function of maleic hydrazide was not known until Uniroyal discovered it. Uniroyal argues that since this function of maleic hydrazide was not previously known, the function of the combination could not have been obvious.

Uniroyal's argument, however, goes to the function and use of the new composition, which is covered in claim 7, and not to the composition itself, which is the subject of claim 1. The composition or product itself was indeed an aggregation of two substances which were known in the prior art, even if the function of one of them was not known. Hence the *A & P* line of cases applies and claim 1 was properly found to be invalid.

## B. *Claim 7.*

■ That claim, the use or method claim, reads:

"The method which comprises treating growing plants with material of the group consisting of [maleic hydrazide] and its salts in a concentration and amount sufficient to alter the growth characteristics of said plants."

Plaintiffs do not challenge this claim as invalid for being obvious or not new; rather they argue that it is invalid because it did not comply with the disclosure and claiming provisions of 35 U.S.C. § 112. That section provides:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. * * * The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter."

Plaintiffs contend that claim 7 is too general to meet these requirements, i. e., that it does not define how to use the new composition with any exactitude, clarity, or distinctness. According to plaintiffs, the words of claim 7 "growing plants" could apply to any of half a million plants, and the patent discloses but a few paltry examples of experimentation with maleic hydrazide on a single variety of tomatoes, corn, peas, a few weeds, and some grasses. Yet the patent proceeds to make claims encompassing the entire plant kingdom without distinguishing among the types. The result, say plaintiffs, is to invite those skilled in the art to engage in broad, extensive, and time-consuming experimentation in order to determine which plants are temporarily inhibited by MH, which are killed, which remain unaffected or are even stimulated to more growth, and what concentration, dosage rate, salts, and wetting agents are to be used to obtain specific results. Moreover, plaintiffs argue, the real utility of MH—for tobacco—is not disclosed or hinted at in the patent, and indeed was discovered by scientists unconnected with Uniroyal.

Plaintiffs also contend that the words "alter the growth characteristics" are too broad, since they could cover growth

promotion as well as inhibition, and that the term "salts" is likewise too broad, since it covers an indefinite amount of compounds, not all of which are operative with the maleic hydrazide.

Judge Mansfield rejected these contentions and we agree. Claim 7 was necessarily broad and generic because Uniroyal's discovery "opened up a new art" and was "an entirely new use for an existing composition" (301 F.Supp. at 284–285), as distinguished from a minor improvement in a crowded art. As the district judge stated, "[a]n inventor who discovers a basic new use is not required specifically to disclose, or even be aware of, all the uses of his invention." 301 F.Supp. at 290–291. See B. G. Corp. v. Walter Kidde & Co., 79 F.2d 20, 22 (2d Cir. 1935).

We reject plaintiffs' argument that the words of the patent were insufficient to enable one skilled in the art to select and determine, out of countless possibilities, the particular concentration, dosage, etc. of MH that would produce the desired result on a particular plant. As Judge Mansfield stated, "the necessity for conducting experimentation or preliminary tests to determine the successful application of an invention * * * will not invalidate a patent, provided one skilled in the art could determine and select the necessary experiments or tests without unreasonable difficulty." 301 F.Supp. 285. See Georgia-Pacific Corp. v. U. S. Plywood Corp., 258 F.2d 124, 136 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

Judge Mansfield found that the disclosures of claim 7 did not place such an unreasonable burden upon one skilled in the art. He found that those skilled in the art in the late 1940's already understood many factors that would limit greatly the number of experiments that would have to have been done. Then he stated:

"The ultimate answer to Ansul's contention lies in the testing conducted by research personnel to whom Uniroyal furnished samples of the MH compound with disclosures as to its new use. With astonishing rapidity they used the new discovery and teachings in routine experiments, featuring routine screening techniques, to develop practical uses for the product. None of this would have occurred, of course, if it had not been for Uniroyal's disclosure of the basic secret with sufficient information for researchers to use the compound in their regular sampling procedures." 301 F.Supp. at 287–288.

Indeed, the two chemists who discovered the usefulness of MH on tobacco and onions were among these experimenters. Thus, Judge Mansfield held that "[i]n the face of such substantial evidence of the minor experimentation needed to perfect the use of the compound, once its generic use had been disclosed, * * * the specification of the 916 patent reasonably 'enable[s] any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .'" 301 F.Supp. at 288.

For similar reasons, Judge Mansfield rejected plaintiffs' argument that the words "alter growth characteristics" were overbroad. With respect to the alleged overbreadth of "salts," Judge Mansfield again found that

"* * * the evidence amply indicated that those skilled in the art had no difficulty in relying on their skill to determine which salts of [maleic hydrazide] they should use. No substantial or difficult experimentation was required for this purpose; the specification served as an effective teacher and it was well known in the art that certain salts would be toxic or prevent absorption of the [maleic hydrazide] by the plant. Consequently, as to those to whom the patent was directed, the term 'salts' was not too broad." 301 F.Supp. at 289.

■ We agree. Admittedly, the disclosures of claim 7 are very general and give meager information as to how to use the product. Yet the test is whether they are sufficient to enable a person skilled in the art to make and use the product without undue experimentation. The question whether the disclosures here were sufficient to do so is a factual matter and there is substantial evidence to support the trial court's findings. Indeed, the speed with which the two chemists used the MH composition successfully on tobacco and onions, once Uniroyal provided them with the composition and with the information that it could inhibit the growth of plants, is clear evidence that claim 7's disclosures were sufficient.

## II. UNIROYAL'S RESALE PRICE MAINTENANCE AND TERRITORIAL RESTRICTIONS AS PATENT MISUSE.

Although the district court found claim 7 of the patent to be valid, it refused to enforce the patent against the infringing plaintiffs because it found Uniroyal's conduct in violation of the antitrust laws to have constituted patent misuse. The fact that most of the overt acts violating the antitrust laws took place before 1965, whereas the infringement did not occur until 1968 and 1969, did not dissuade the court from its finding of misuse, since it found that Uniroyal's unlawful conduct in enforcing its price and territorial restrictions continued to some extent between 1964 and 1969 and that, in any event, the effects of its prior restraint of trade were not dissipated until the 916 patent expired in October 1969.

Uniroyal challenges this determination on two main grounds: (1) that as a matter of law the antitrust restraints found by the trial court do not constitute patent misuse; and (2) that as a matter of fact, even if they do, Uniroyal did not engage in any such restraints during the period of the infringement and all effects of any prior restraint had been dissipated by the time of the infringement.

### A. *Whether the Antitrust Restraints Constitute Patent Misuse.*

Uniroyal argues that the resale price maintenance and territorial restrictions, even if proved during the infringement period and even if illegal under the antitrust laws, were not sufficiently related to the 916 patent to bar its enforcement against infringers. According to Uniroyal, "an antitrust defense does not amount to patent misuse merely because it involves patented products or products which are the subject of a patented process"; and here, says Uniroyal, there was just not enough connection between the 916 patent and Uniroyal's restraints on trade.

Judge Mansfield, however, found the opposite. Although he agreed with Uniroyal's broad generalization quoted above, he felt that "[w]here the patent plays a major role in enabling its holder unlawfully to restrain trade, public policy against abuse of the limited lawful monopoly requires that its enforcement against infringers be stayed until the effects of the restraint have been purged or dissipated." 306 F.Supp. at 558. He cited three cases for the proposition that the patent misuse doctrine applies to use of the patent as a vehicle for illegal price fixing or imposition of other restrictions upon resale of the patented product, in the three cases through express patent license agreements. United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 472, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); Hensley Equip. Co. v. Esco Corp., 383 F.2d 252 (5th Cir. 1967); Newburgh Moire Co. v. Superior Moire Co., 237 F.2d 283 (3rd Cir. 1956). Application of the doctrine, he stated, depends upon whether the patent itself significantly contributes to the unlawful antitrust practice.

In the circumstances of this case, the trial judge found, the 916 patent did play such an important and integral role in Uniroyal's marketing program. He found that:

"[w]ithout the patent Uniroyal would not have been able to impose upon dis-

tributors its resale price maintenance and territorial restrictions, since the composition MH–30, in the absence of the patent, would have been available to distributors from alternative sources and Uniroyal would have been relegated to the same type of price and market competition that had existed before it initiated its 'orderly market' program. The key to the success of the latter program was the 916 patent." 306 F.Supp. at 558.

Moreover, he stated that "[e]ven if patent misuse turned upon the presence of a license, each sale of MH–30 constituted an implied license under Claim 7 of the 916 patent to use the product for control of plant growth." *Id.* Thus, he failed "to see any legally significant difference between Uniroyal's annual contracts granting to distributors the [implied license] to sell MH–30 in certain territories for use in controlling plant growth, coupled with resale price maintenance through 'suggested' resale price lists, and the [express] license agreements declared unenforceable" in cases such as the three he cited. *Id.* Hence he held Uniroyal's antitrust violations to constitute patent misuse.

Uniroyal disputes the district court's findings on two major grounds. First, it claims that Judge Mansfield erred in failing to recognize a distinction between this case, involving selling a patented product, and the patent-license cases such as the three he cited.[1] Second, Uniroyal argues that Judge Mansfield erred in

finding that without the patent, it would not have been able to impose its restraints. According to Uniroyal, a manufacturer without a patent can impose such resale price maintenance and territorial restrictions, as is shown by numerous cases where manufacturers of unpatented articles have been found guilty of imposing such restraints effectively, primarily through the monopoly power inherent in brand-name products.[2]

We reject Uniroyal's contentions. The monopoly power granted by a patent can be illegally expanded to fix resale prices and control secondary distribution just as well through the use of "annual sales contracts" as through the use of express patent licenses. Here, since MH was an easily formulated commercial chemical, the only reason that Uniroyal was able to impose the restraints it did with any degree of success was that it owned the patent on MH and thus had a monopoly on its sale. This is by itself enough of a significant connection between the patent and the restraints to uphold Judge Mansfield's findings in this regard. In any event, we agree with the trial court's holding that each sale of MH–30 constituted an implied license to use the product.

Second, Uniroyal misses the point in showing that other types of market power, notably brand-name power, have on occasion enabled manufacturers to fix resale prices of unpatented merchandise. Judging from Ansul's quick success with "Sucker Stuff," tobacco farmers were

---

1. According to Uniroyal, the distinction is as follows:

"In the case of a patent license, the licensor-patentee may use the patent right itself to enforce any restrictions imposed on the licensee. He requires the latter, explicitly or implicitly, either to accept the restrictions or be barred from using the patent. If necessary, he can sue for infringement, and that certainly involves using the patent to enforce the restriction. In contrast, where the patentee, having sold the patented product, seeks to maintain resale prices or territorial restrictions, the customer who refuses to comply is not coerced by the threat of an infringe-

ment suit, but by the possibility of the seller's refusing to sell the patented commodity. He does not have the patent to use as a weapon; his remedy is exactly the same as that of any seller of any unpatented article."

2. See Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

little impressed with uniroyal's brand name; and hence it is clear that it was its patent that enabled it to impose the restrictions involved.

#### B. *Whether in Fact the Restraints Were Continued and Their Effects Still Present at the Time of Infringement.*

Uniroyal makes several related arguments in this connection: (1) that plaintiffs proved no overt acts of patent misuse or antitrust restraint during 1968–1969, the period of Ansul's infringement; (2) that by that time, it (Uniroyal) had dissipated all effects of any restraint of trade caused by its prior resale-price-maintenance scheme and that in fact there was vigorous and free price competition in the MH–30 market before the infringement commenced and certainly by 1969; and (3) that the territorial assignments or designations in its franchise contracts did not constitute patent misuse during the infringement period, since it ceased enforcing those assignments as restrictions and dissipated their consequences well before 1968, and since the Supreme Court did not clearly hold territorial restrictions to be unlawful until June 1967 in United States v. Arnold, Schwinn & Co., 388 U. S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Judge Mansfield found to the contrary on each of these contentions (306 F.Supp. at 559–562), and there is substantial evidence in the record to support his findings. For example, according to the trial judge, Uniroyal's failure to demonstrate a purge was evidenced in part by

"proof that despite price deterioration in 1967 and 1968 most sales were made at the suggested prices, and that Uniroyal thereafter took affirmative steps to perpetuate its stabilization of the market, including its January 1968 reminder to the trade that it would support distributors' selling efforts by suing any infringers of its 916 patent, its increasing 1968 prices in a way that imposed a price-profit squeeze upon distributors that would tend to discourage them from cutting resale prices, its sponsorship of the April 1968 Myrtle Beach distributors' meeting at which 'orderly marketing' [adherence to resale prices and market restrictions] and prices were discussed, salesman Rivers' continuation of his practice of obtaining reports from distributors on dealers' pricing practices, its continued refusals to grant distributors' requests for enlargement of their sales territories, and its refusal to reinstate some distributors previously cut off because of failure to adhere to its resale prices or territorial restrictions." 306 F.Supp. at 561–562.

In addition, Uniroyal's continued use of price lists and annual contracts up to the 1969 growing season, its casual indications to complaining distributors that it would enforce the territorial restrictions and suggested prices, and its "7/11 Plan" unveiled in March 1969 [3] are all inconsistent with its argument that by 1968 and certainly thereafter it had dismantled the system which it had constructed in 1960–63 and had dissipated its effects.

---

3. Under that plan, as Judge Mansfield described it,

"Uniroyal granted an immediate 7% discount off its regular price to the distributor, provided the distributor committed himself to purchase the first 35% of his season's requirements from Uniroyal. In order to induce the distributor to purchase his entire season's needs from Uniroyal, the latter agreed to continue the 7% discount in effect upon additional purchases up to 70% of the distributor's needs, provided the

distributor bought the additional 35% by a certain specified date. In addition Uniroyal agreed to buy back inventory on the distributor's hands at the end of the season up to 11% of the distributor's season purchases. The effect of the plan, in which practically all of Uniroyal's earlier distributors participated, has been to enable Uniroyal to some extent to perpetuate its earlier pricing practices, albeit with less command than before Ansul's entry into the market." 306 F.Supp. at 556.

Indeed, we are convinced, as Judge Mansfield was, that "this pattern of conduct, rather than evidencing a purge, indicated a desire to prolong the effects of its anti-competitive conduct." 306 F.Supp. at 562.[4]

## III. THE TREBLE DAMAGE CLAIMS

### A. *Ansul's Claim.*

Plaintiff Ansul argues that it is entitled to recover treble for its expense. incurred in defending Uniroyal's patent infringement suits against it and against the various distributors which it had agreed to indemnify. Ansul contends that these suits were part of Uniroyal's endeavors to perpetrate its unlawful market scheme, for, as the trial court found, "these suits, together with Uniroyal's other activities * * * had the effect of perpetuating the price and market stabilization achieved through its earlier violations of § 1 of the Sherman Act * * *." 306 F.Supp. at 567. Hence, it argues, its expenses in defending those suits are properly recoverable under Hazeltine Research, Inc. v. Zenith Radio Corp., 388 F.2d 25, 35 (7th Cir. 1967), aff'd in part, 395 U.S. 100, 89 S. Ct. 1562, 23 L.Ed.2d 129 (1969), where the court stated: "Zenith's expenses in defending the infringement suit brought pursuant to HRI's antitrust violations are a proper subject of threefold recovery."

Judge Mansfield, after making the statement quoted above as to the *effect* of these suits, then rejected Ansul's contention stating that

"even though the suits were one of many activities which collectively had the effect of inhibiting an effective purge of [Uniroyal's] earlier misconduct, they were instituted by it in good faith and for the purpose of resolving the issues of validity and infringement rather than with the intent or purpose of restraining trade in violation of the Sherman Act. Thus Uniroyal's suits must be distinguished from those brought in furtherance of an antitrust conspiracy * * *." 306 F.Supp. at 567.

Ansul argues that intent is not necessary to a Sherman Act § 1 violation and that whatever its actual intent may have been, Uniroyal as a proven antitrust violator is conclusively presumed to be responsible for the direct consequences of its acts. Hence, according to Ansul, even if the intent of Uniroyal's suits was legitimate, the fact that their effect was to further the unlawful conspiracy makes them part of that conspiracy and thus allows Ansul to recover treble its expenses in defending them.

We agree with the result reached by the district court. A patentee who has reasonable grounds for believing that his patent is valid and that it is being infringed should not lightly be precluded from availing himself of the courts. Whatever other anticompetitive activity the patentee may be guilty of, the patent laws would seem to authorize him to bring such a nonfrivolous suit.

---

4. Uniroyal also disputes the district court's finding that a separate patent misuse began on June 6, 1969, the date on which the district court held the product claim on MH to be invalid. Since Uniroyal could no longer lawfully use its *method* (*use*) patent monopoly to secure a monopoly over sales of the unpatented *product*, it came under an obligation (if it wished to avoid the charge of patent misuse) to license its patented *use* of the unpatented *product* for those who wished to buy the product from other manufacturers. We agree with Judge Mansfield's determination, 306 F.Supp. at 562–564,

that the price at which Uniroyal offered licenses was so high that it would never pay to obtain the use license from Uniroyal and the product from someone else rather than simply buy the product from Uniroyal with the implied use license attendant upon any sale of the product by Uniroyal. This was either a non-compliance or discriminatory, since those who bought the product from Uniroyal were paying less for their implied use license than anyone foolish enough to buy an express use license from Uniroyal in order to use the product purchased from others.

Denying him recovery on the ground of misuse is a sufficient vindication of antitrust policy, at least where the patentee is no longer actively engaging in antitrust violations at the time he brings his suit. Here, although the trial court was justified in concluding that the *effects* of Uniroyal's former violations had not been dissipated by the time of Ansul's and the other plaintiffs' infringement, Uniroyal had ceased actively engaging in at least its most objectionable antitrust violations. At least under such circumstances, Ansul, as a proven infringer, should not be permitted to recover treble damages for the costs of defending the patentee's nonfrivolous infringement suits.

### B. *Daly-Herring's Claim.*

Plaintiff Daly-Herring seeks treble damages since it was terminated by Uniroyal in 1965, allegedly because of its failure to abide by Uniroyal's unlawful scheme. Uniroyal contends that the termination was for legitimate business reasons. Judge Mansfield found that Daly-Herring did not meet its burden of proof on this issue. 306 F.Supp. at 569.

The resolution of this question, then, turns upon whether the trial court properly placed the burden of proof on the plaintiff. Daly-Herring argues that this was error. It contends that in an antitrust action such as this, where the defendant had terminated numerous distributors for unlawful reasons and where the plaintiff did not abide by defendant's scheme so that plaintiff's termination would serve defendant's interests, the inference is that plaintiff's termination was unlawful and defendant should have the burden of showing that it was not. Daly-Herring cites Interstates Circuit v. United States, 306 U.S. 208, 225–226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939), where the Court stated:

"When the proof supported, as we think it did, the inference of such concert, the burden rested on appellants of going forward with the evidence to explain away or contradict it."

See also United States v. Paramount Pictures, 334 U.S. 131, 148, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

We disagree with Daly-Herring's claim. The only burden changed by *Interstate Circuit* is the burden of going forward with the evidence, and Uniroyal certainly met that burden here. The burden of persuasion, however, remains with the plaintiff, as the Supreme Court stated in *Arnold, Schwinn:*

"The burden of proof in antitrust cases remains with the plaintiff, deriving such help as may be available in the circumstances from particularized rules articulated by law—such as the per se doctrine." 388 U.S. at 374 n. 5, 87 S.Ct. at 1863.

As the district court found, Daly-Herring did not meet that burden here.

### C. *Louisville's Claim.*

Plaintiff Louisville seeks treble damages since it had been terminated by Uniroyal in 1963 for failing to adhere to Uniroyal's unlawful resale-price-maintenance scheme and for selling to unapproved price-cutting dealers, and since it thereafter suffered a loss of substantial profits because it could not buy MH–30 for resale except on a "bootleg" basis, with difficulty, and at higher prices. Louisville argues that since the initial termination violated the antitrust laws and since its continued damage thereafter was caused by the continuing *per se* illegal market restraint, Louisville was within the target area of the conspiracy and is entitled to treble damages.

Judge Mansfield rejected this claim. He did agree that Louisville's termination in 1963 was caused by its failure to adhere to Uniroyal's unlawful scheme; but he held that its claim was barred by the Clayton Act's four-year statute of limitations, 15 U.S.C. § 15b, since the effective commencement date of Louisville's suit was May 31, 1968. He rejected Louisville's contention that the antitrust conspiracy was a continuing one and that further causes of action accrued in its favor when it was refused reinstatement and was unable to

purchase its full requirement of MH–30. He stated:

> "Louisville's damages flowed from the 1963 termination, which was the last overt act causing it damages, rather than from Uniroyal's later refusals to reinstate it, which amounted to a mere continuance or reassertion of the original termination and did not give rise to new claims or toll the running of the statute. Garelick v. Goerlich's, Inc., 323 F.2d 854 (6th Cir. 1963); Molinas v. National Basketball Ass'n, 190 F.Supp. 241 (S.D.N.Y.1961) (opinion by Judge Irving R. Kaufman); Fleischer v. A. A. P., Inc., 180 F.Supp. 717 (S.D.N.Y.1959). The situation here is identical in all pertinent respects with that in *Garelich* [sic] and *Molinas,* where the courts specifically rejected the argument that continued refusals to deal or to reinstate gave rise to new causes of action. It must also be distinguished from that where the original wrongdoer later engages in new and different acts which are the competent producing cause of separate damages not flowing from the original overt act." 306 F.Supp. at 569.[5]

On this issue, we do not agree with the district court's disposition. The governing principles have now been expounded by the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 334–343, 91 S.Ct. 795, 804–808, 28 L.Ed.2d 77 (decided Feb. 24, 1971), of which Judge Mansfield did not have the benefit. In that case, the Court held that a plaintiff in an antitrust action may recover damages occurring within the statutory limitations period that are the result of conduct occurring prior to that period if, at the time of the conduct, those damages were speculative, uncertain, or otherwise incapable of proof. Mr. Justice White, writing for the Court, saw an anomoly in the application of the four-year statute of limitations in antitrust cases. On the one hand, each cause of action accruing in an antitrust action "entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion. * * *" 401 U.S. at 338, 91 S.Ct. at 806. On the other hand, "[t]o recover those damages, he must sue within the requisite number of years from the accrual of the action [and] it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." *Id.* Thus, Mr. Justice White concluded,

> "In antitrust and treble damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the

5. Louisville challenges this holding, arguing that not all of its damages stemmed from the 1963 cutoff, but rather that it suffered damages as a direct result of the *per se* illegal restraints on resale trade in MH–30 imposed by Uniroyal and substantially adhered to by its authorized distributors during the four-year period immediately prior to suit, each time it purchased or unsuccessfully sought to purchase MH–30 within that period. Hence, it argues, Uniroyal's violation was not merely a continuing refusal to reinstate, but the commission of numerous acts within the limitations period which were expressly found by the trial court to have resulted in the continuance and perpetuation of the unlawful scheme throughout that period, and which caused damage to Louisville by preventing it from obtaining MH–30, at least at the normal price.

Since we reverse the district court's determination in this regard on the basis of Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 334–343, 91 S.Ct. 795, 804–808, 28 L.Ed.2d 77 (decided Feb. 24, 1971), we see no need to pass on the merits of Louisville's argument.

date they were inflicted [citations omitted]. Otherwise future damage which could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery. * * *" *Id.*

Applying *Zenith* to the instant case, in order to hold that Louisville's entire claim accrued when it was unlawfully terminated in 1963, we would have to be able to say that it could have proved its damages with sufficient certainty at that time to warrant a judgment in its favor for the entire period during which Uniroyal was engaging in antitrust violations that affected it. Obviously, in light of Judge Mansfield's finding that the effects of Uniroyal's unlawful restraints endured until 1969, such a statement could not be justified. Louisville had no means of knowing to what extent it would be able to fill its requirements of MH–30 from other distributors or at what price. Indeed, if Louisville had asserted in 1963 that it would lose all sales, and had endeavored to compute damages on that basis, we can be quite confident that Uniroyal would have forcefully contended that this was not necessarily so.

For these reasons, we hold that Louisville is entitled to recover threefold those damages for the period beginning on May 31, 1964 which could not be proved with reasonable certainty in late 1963. We remand the case to the district court for a determination of the amount of such damages.

With respect to the costs incurred by plaintiffs on this appeal, we direct that plaintiffs be granted one-third of those costs, to be credited entirely to plaintiff Louisville.

Affirmed in part; reversed and remanded in part.

### On Petition for Rehearing

Before FRIENDLY, Chief Judge, and LUMBARD and KAUFMAN, Circuit Judges.

PER CURIAM:

Appellant Daly-Herring Co. having petitioned the court for a rehearing of its decision of April 29, 1971, and an answer having been received from Appellee Uniroyal, Inc., and Appellee Uniroyal, Inc., having also petitioned for a rehearing and an answer having been received from Appellant Louisville Chemical Co.,

It is ordered that both petitions for rehearing be and they hereby are denied.

Daly-Herring argues in its petition for rehearing that we did not deal in our opinion with the fact that it, as well as Louisville Chemical, urged on appeal that it was entitled to recover treble damages on the ground stated in footnote 5 of our opinion with respect to Louisville— that is, that

"it suffered damages as a direct result of the *per se* illegal restraints on resale trade in MH–30 imposed by Uniroyal and substantially adhered to by its authorized distributors during the four-year period immediately prior to suit, each time it purchased or unsuccessfully sought to purchase MH–30 within that period."

Because we granted treble damages to Louisville on other grounds, we did not pass on the merits of this question. Therefore, Daly-Herring now contends, we have not completely disposed of its appeal.

We recognize that we have omitted any discussion of Daly-Herring's argument in this regard. As stated in its petition for rehearing, that argument has two parts:

"Each time it sought to purchase MH–30, it found that it could not do so because of Uniroyal's specific prohibition against sub-distribution, or it found that to the extent it could purchase MH–30, it could not resell at a profit because prices at all levels of trade were fixed by Uniroyal [and thus Daly-Herring] had to pay higher prices therefor during the period it was an unauthorized distributor."

In order to prove the first part of this argument—that Daly-Herring could not buy all the MH–30 it needed

after its termination, because of Uniroyal's unlawful scheme—Daly-Herring offered at trial the testimony of its president and sales manager, who swore that after the termination by Uniroyal it was unable to obtain MH–30 from certain other distributors. Contrary to Uniroyal's contention in answering Daly-Herring's petition for rehearing, the district judge did not reject this contention; indeed, he made no ruling on the question whatsoever. Nevertheless, we believe that Daly-Herring's evidence was adequately refuted by the testimony and records of such other distributors revealing substantial sales of MH–30 by them to Daly-Herring after its termination or, in some cases, that they would have been willing to sell MH–30 to it but were never asked. Moreover, no distributor testified that Uniroyal had actually required or asked him not to sell MH–30 to Daly-Herring, and no one testified that he had turned down an order from Daly-Herring. Hence, whether or not Daly-Herring would be entitled to threefold recovery if it could prove that Uniroyal's illegal scheme prevented it from obtaining MH–30, we do not believe that Daly-Herring proved its case by a preponderance of the evidence.

As to the second part of Daly-Herring's argument—that to the extent that it could obtain MH–30, it had to pay more for the product because of Uniroyal's price-fixing conspiracy than it would have in an unrestrained market—Daly-Herring cites us to no place in the record where it made that contention below and the district court did not treat it. We are thus led to believe that Daly-Herring did not raise this issue until its appeal, and in such a situation it is clear both that the claim was not proven at trial and that it cannot be raised for the first time in this Court. Schwartz v. S.S. Nassau, 345 F.2d 465, 466 (2 Cir.), cert. denied, 382 U.S. 919, 86 S.Ct. 294, 15 L.Ed.2d 234 (1965).

For these reasons, we deny Daly-Herring's petition for rehearing.