577 F.2d 106
 1978-1 Trade Cases 62,072
 COLONIAL FORD, INC., a Utah Corporation, Plaintiff,
Appellee, Cross-Appellant,
v.
FORD MOTOR COMPANY, a Delaware Corporation, Defendant, Appellant,
and
Ford Motor Credit Company, a Delaware Corporation,
Defendant, Appellant, Cross-Appellee.
 Nos. 76-2079, 76-2080 and 76-2083.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 17, 1978.
Decided May 31, 1978.
 
 Peter W. Billings, Jr., Salt Lake City, Utah (Peter W. Billings, Stanford B. Owen, Ted D. Smith, Fabian & Clendenin, Salt Lake City, Utah, with him on brief), for defendant, appellant, Ford Motor Company.
 Harold G. Christensen, Salt Lake City, Utah (R. Brent Stephens, Snow, Christensen & Martineau, Salt Lake City, Utah, and George V. Burbach, Dearborn, Mich., of counsel, with him on brief), for defendant, appellant, cross-appellee, Ford Motor Credit Company.
 Daniel L. Berman, Salt Lake City, Utah (Richard W. Giauque, and Gordon Strachan, of Berman & Giauque, Salt Lake City, Utah, with him on brief), for plaintiff, appellee, cross-appellant, Colonial Ford, Inc.
 Before SETH, Chief Judge, and DOYLE and McKAY, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 Colonial Ford, Inc. brought this action against Ford Motor Company and Ford Motor Credit Company. There were several causes of action alleged in the complaint; however, only two were submitted to the jury. These were a cause under Section 1 of the Sherman Act, and the second was under the Automobile Dealer Franchise Act, 15 U.S.C. § 1221.
 
 
 2
 The plaintiff corporation had been a Ford dealer in Utah, and during most of the time here concerned, it was owned by LeGrande Belnap, as the principal owner, and by Marshall Pease who had a contract to buy a forty-nine percent interest from Mr. Belnap.
 
 
 3
 The defendant, Ford Motor Credit Company, is a wholly-owned subsidiary of Ford Motor Company, and provides financing to Ford dealers for cars and real estate. It also provides financing to a much lesser extent for undertakings not related to the automobile business. It had provided the financing for cars purchased by Colonial from Ford Motor, the floor planning, and financed the building of a new facility for Colonial, taking back a deed of trust on the real estate. The defendant Ford Motor Credit counterclaimed to recover the amounts asserted to be due from Colonial on the floor-plan agreement, together with related accounts, and to accelerate the amounts due under the real estate loan because of Colonial's failure to pay installments.
 
 
 4
 The trial court, before trial, issued an injunction against both defendants to prevent (1) a foreclosure under Ford Credit's deed of trust; (2) repossession of the floor-planned cars, and (3) to require the continuation of the previous floor-plan credit arrangement to provide for the purchase of cars from Ford Motor during the litigation.
 
 
 5
 The two causes of action were submitted to the jury, and the jury found for Colonial Ford against Ford Motor Company, only, on the Automobile Dealer Franchise Act claim in the amount of $210,000.00. The jury found for the defendant Ford Credit on the Dealer Act claim against it, and for both defendants on the Sherman Act cause. The jury also answered several special interrogatories.
 
 
 6
 Shortly after trial the court terminated the injunction as to the floor-planned cars in Colonial's possession, and permitted Ford Credit to repossess the new and used car inventory. The court also authorized Ford Credit to stop floor-plan financing which had been continued under the injunction. The injunction was however continued to prevent Ford Credit from foreclosing on its deed of trust, and also from executing on its judgment of $2,897,125.22 for balances due from Colonial entered on its counterclaim.
 
 
 7
 All parties have appealed. The plaintiff's points on appeal relate to the Automobile Dealer Franchise Act cause of action, and to the real estate acceleration issue. Thus Colonial urges:
 
 
 8
 1. There was coercion by Ford Motor under the Dealer Act.
 
 
 9
 2. The coercion caused Colonial to have liquidity problems and a lack of working capital.
 
 
 10
 3. Ford Credit is subject to the Dealer Act as a matter of law, and such issue should not have been submitted to the jury.
 
 
 11
 4. The instructions were erroneous as to the application of the Dealer Act to Ford Credit.
 
 
 12
 5. The trial court erroneously determined that there was no waiver by Ford Credit of the acceleration provisions of the real estate financing agreement.
 
 
 13
 Ford Motor Company urges in its appeal that the court's interpretation of the Dealer Act and instructions given the jury on the Act were erroneous especially as they concerned good faith and "wrongful demands." It also argues that the jury should not have been permitted to consider the acts of Ford Credit in the application of the Dealer Act to Ford Motor. Ford Motor also urges that there was no valid evidence of damages.
 
 
 14
 Ford Credit argues that it was error to continue the injunction preventing foreclosure pending appeal.
 
 
 15
 As mentioned above, the plaintiff urges that the Automobile Dealer Franchise Act, 15 U.S.C. § 1221, was applicable to Ford Motor Credit Company as a matter of law. This argument is centered on the fact that Ford Credit is a wholly-owned subsidiary of Ford Motor, and was floor-planning the cars purchased by plaintiff Colonial from Ford Motor.
 
 
 16
 The Dealer Act is directed to manufacturers, to assemblers, and to distributors of automobiles. It is further directed to the performance or termination of the franchise agreement between those so engaged and the dealers.
 
 
 17
 It is apparent from the record that Ford Credit is not a manufacturer, assembler, or distributor, and further that it had no franchise agreement with plaintiff. Thus on the face of the Act, it was not applicable to Ford Credit. See Stansifer v. Chrysler Motors Corp., 487 F.2d 59 (9th Cir.); Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608 (7th Cir.); York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786 (5th Cir.). The Act also includes any other entity ". . . which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221(a). The "acts for" or "under the control" provisions must relate to the transactions or circumstances out of which the cause of action arose. Testimony and evidence must develop these factors in each case, and the "control" must be shown to be in connection with the "distribution" of automobiles. Referring to these elements of the statute as "control," it is apparent under the Act that the development during trial is directed to actual and to practical considerations there existing. This must be the description of a fact question in ordinary circumstances, and was such a matter here. The examination of several witnesses was directed to this issue, and especially in the questioning of the official of Ford Credit who made the decision to terminate the floor planning, Mr. Thomas. The "under control" and "acts for" elements here created a fact issue for submission to the jury. The wholly-owned subsidiary aspect was certainly a factor or an opportunity, but in the abstract it could not be a determining factor. The plaintiff centers on the financing of cars purchased from Ford Motor as part of distribution, but this is not persuasive as this position was shown to be no different from that occupied by the local bank which had previously floor-planned for plaintiff.
 
 
 18
 We find no error in the instructions given to the jury on the Dealer Act application to Ford Credit. The statutory elements were covered in the instructions, and contrary to plaintiff's arguments the acts must be directed to the franchise as above pointed out. This was covered by the instructions and necessarily related to the parties to the franchise agreement.
 
 
 19
 The fact question was thus properly submitted to the jury, and it decided it. In answer to special interrogatories, the jury responded that Ford Credit had not failed to act in good faith in its business relations with Colonial under the Act. Also it replied that the acts of Ford Credit did not prevent or make it more difficult for Colonial to meet its financial obligations to Ford Credit.
 
 
 20
 We thus find no error in the submission of the Dealer Act question as to Ford Credit to the jury, and the verdict must stand.
 
 
 21
 The plaintiff, in reference to the real estate financing, urges that the trial court should not have applied the acceleration provisions of the deed of trust and security agreement. This financing was by Ford Credit, and it is undisputed that installments were not paid by plaintiff when due in the period September 1974 until September 1975, and there was about $130,000.00 past due. In May 1975, Ford Credit sent a notice to plaintiff exercising its right to accelerate under the deed of trust and security agreement. The same month the trial court entered a temporary restraining order, followed by an injunction which required continuance of the financing as it existed before the termination of floor-planning, which required that Ford Credit take no action to foreclose or repossess, and generally required Ford Credit to carry out its previous financial relationship with plaintiff; thus to continue to extend credit. While this injunction was in effect, plaintiff made some installment payments on the real estate. The trial court stated that the acceptance of such payments, without any satisfaction by plaintiff of the older obligations, did not establish ". . . a factual premise for the acceptance of waiver claimed by plaintiff." It would seem sufficient to observe that the injunction altered significantly the relationship and obligations of the parties under the deed of trust and the security agreement, and that the trial court could determine the impact of its injunction and his intent in its issuance as to the waiver issue. Thus the trial court's interpretation of the injunction as to this issue must be accepted and is accepted. The matter was then clearly outside normal business relations and outside the voluntary elements of such relations. We find nothing in United States v. Colombine Coal Co., 27 Utah 2d 140, 493 P.2d 983 (Utah), or in Swain v. Salt Lake Real Estate & Investment Co., 3 Utah 2d 121, 279 P.2d 709, to lead to a contrary conclusion.
 
 
 22
 The order or injunction of the trial court preventing foreclosure by Ford Credit under the deed of trust and preventing execution under its judgment is hereby set aside.
 
 
 23
 Ford Motor Company in this appeal urges that the trial court misconstrued the Automobile Dealer Franchise Act (15 U.S.C. § 1221), and failed to give certain instructions to the jury and also gave instructions which were erroneous. Ford Motor in this argument asserts that there must be a wrongful demand on the dealer coupled with a threat of reprisal related to the franchise.
 
 
 24
 Ford Motor first urges that there was no written "franchise" and Colonial was not a "dealer" until September 2, 1969. Thus acts of Ford Motor before that time cannot be a violation of the Dealer Act. However, it is apparent that several of the most significant requirements imposed by Ford Motor as conditions to be met before a franchise would be given were made before that date. It is a sufficient answer that these conditions were carried over into the formal dealership period. Two examples are the requirement that Mr. Pease be given a contract to buy into the dealership when created to the extent of forty-nine percent, and that the place of business be changed to a new location with new facilities. Ford Motor in its brief even refers to the relocation as "an inducement to being granted a franchise." Ford Motor also treats the relocation matter as "contractual."
 
 
 25
 It is clear from the record that Ford Motor required Mr. Belnap to agree to sell Mr. Pease a forty-nine percent interest in the Colonial corporation. This condition or requirement carried over into most of the pertinent period.
 
 
 26
 There were other incidents which were supported by some evidence and submitted to the jury as part of plaintiff's case to show a violation of the Dealer Act.
 
 
 27
 As indicated above, Ford Motor urges that the instructions were incomplete and erroneous as to the proof required to prove a violation of the Act. We cannot describe or analyze all the instructions here. Considering the instructions as a whole, as we must, the trial judge properly instructed on " coercion," "intimidation," and "good faith." It instructed that "good faith" was to ". . . be determined in a context of actual or threatened coercion or intimidation." See Hanley v. Chrysler Motors Corp., 433 F.2d 708 (10th Cir.). Also, if Ford ". . . through a series of acts, deprived (plaintiff dealer) of the right as an independent businessman to control its own business to serve (Ford Motor's) own economic interest and in disregard of (the dealer's) interest, . . ." a violation of the Act could result. The court against this set out Ford Motor's right under the Act to "urge," "argue," "explain," "endorse," "recommend," and "persuade." The court also instructed that Ford Motor ". . . may reasonably be concerned with the management, facilities, finances and inventory of its dealers, . . . may require a dealer to adhere to reasonable standards in these areas of the dealer's operations." The instructions that Ford Motor could "require" the dealer to follow reasonable standards as to facilities and finances are clear, and correctly submitted this aspect to the jury. The court did not use the "wrongful demand" "coercion" coupling Ford Motor urges, but this was not required to be separately treated in those words. Also we find no error in the use in the instructions of such terms as "arbitrarily," "unreasonably," or "oppressive."
 
 
 28
 We, of course, held in Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., 533 F.2d 510 (10th Cir.), that mere arbitrariness of an automobile manufacturer does not constitute a violation. The instructions before us do not constitute such a submission to the jury. See also Milos v. Ford Motor Co., 317 F.2d 712 (3d Cir.).
 
 
 29
 We find no error in the instructions, and hold that the issues were properly submitted to the jury.
 
 
 30
 To consider only one of several elements presented to the jury, that is, the requirement that Mr. Pease be given a right to buy in the dealership, we must hold that there was sufficient evidence upon which the jury could base its verdict, having been properly instructed. It appears that Mr. Pease was placed on the scene by Ford Motor, and then inserted into the enterprise as a condition to the granting of a franchise. The Dealer Policy Board deferred action on the franchise application until Mr. Pease was given the buy-in agreement, and instructed the local representative of this. This was the period May to September 1969. There was testimony that Ford Motor wanted Mr. Pease to have "full control."
 
 
 31
 Under the buy-in agreement, Mr. Pease apparently paid $20,000.00 down, and the balance of the large sum required to pay for the forty-nine percent interest was to come from profits from the dealership. It appears that the initial payment was withdrawn by him, although the record is not entirely clear. In any event, the jury could well infer that Mr. Pease was given a free ride in the acquisition of a forty-nine percent interest in a large dealership, all as a condition to granting the franchise. Mr. Pease was not in a position to provide additional capital for Colonial which Ford Motor found to be necessary. Thus the corporation could only look to the fifty-one percent interest owner for more capital contribution. The insertion of Mr. Pease thus created this fundamental corporate problem related to capital requirements. Mr. Pease and Mr. Belnap both had full managerial authority and responsibility under the franchise, both were told in mid-1974 of the need for additional capital. The buy-in agreement between Mr. Belnap and Mr. Pease provided that Mr. Pease would discharge his managerial duties in a manner acceptable to Ford Motor. There was testimony that the buy-in agreement was intended to provide Mr. Pease with control over the operation of the agency. Mr. Belnap in October 1974 negotiated Mr. Pease out of the agency, but at a time when the several problems had become so serious that the agency was failing.
 
 
 32
 Thus again, there was sufficient evidence that the requirements made by Ford Motor or conditions to granting the franchise had a direct consequence on the liquidity of the dealership. This in turn provided a basis for the damage award. Ford Motor urges that the damages were derived only from the cutoff of floor planning, but we find no support for this position. There was evidence of change in profits and volume which was adequate evidence.
 
 
 33
 The Automobile Dealer Franchise Act, 15 U.S.C. §§ 1221-1225, in section 1223 provides for a three-year limitation period. Three years before the date of filing the action would be May 15, 1972. See our opinion in Hanley v. Chrysler Motors Corp., 433 F.2d 708 (10th Cir.), decided in 1970. The plaintiff argues that the limitation issue is controlled by Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77, decided in 1971. The Zenith case was an antitrust case under section 4 of the Clayton Act, with a four-year limitation period. Ford Motor argues that Zenith is not applicable to this type of case, and in any event, that any prelimitation incidents were brought with the Zenith exceptions by the plaintiff and refers particularly to the Belnap-Pease buy-in agreement. Ford Motor in its brief states:
 
 
 34
 "Thus even assuming that Colonial ever had a claim for the alleged transfer of control from Belnap to Pease, the last alleged act of Ford was to force the signing of the Belnap-Pease agreement. The execution of that agreement was 'by its nature permanent at initiation without further acts.' "
 
 
 35
 The parties cite Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117 (5th Cir.); Continental-Wirt Electronics Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d Cir.); and Ansul Co. v. Uniroyal, Inc., 448 F.2d 872 (2d Cir.).
 
 
 36
 The control-liquidity problems were developed in the record. There was testimony as to several reasons why the problem arose in the dealership which are not mentioned in this opinion, but upon which the jury could well have based its verdict. There was evidence sufficient to establish, for the jury, a causal connection between the size or cost of the new location and facilities, and the problem; and similarly the testimony as to inventories, parts, flooring expense as related to inventory, and others. The liquidity problem existed, and was at its worst in the 1972-1974 period. As indicated, Ford Motor complained about the problem to plaintiff several times during the first half of 1974.
 
 
 37
 We see no reason why the doctrine announced in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 725, 28 L.Ed.2d 77, as to the period of limitations, should not be here applied. The acts of the manufacturer sought to be reached under the Automobile Dealer Franchise Act, 15 U.S.C. § 1221, are so comparable to the acts condemned in the antitrust treble damage statutes that the same considerations should be used in the application of the limitation provisions. It is apparent that the Court in Zenith was speaking only to the antitrust action when it expressed the basic accrual of a cause of action, and availability of proof connection upon which the decision was based. Thus the Court said:
 
 
 38
 "In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted."
 
 
 39
 The proof of damage problem as to the liquidity-management claims obviously was the same as in Zenith.
 
 
 40
 The courts in cases following closely in time the Zenith decision have said as in Continental-Wirt Electronics Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d Cir.), an antitrust action:
 
 
 41
 ". . . However, if the district court should find that some portion of Waterman's damages were too speculative to be ascertainable at the time the overt act which produced them occurred, then those damages which become ascertainable within the four years prior to the filing of the complaint will be recoverable."
 
 
 42
 Also in Ansul Co. v. Uniroyal, Inc., 448 F.2d 872 (2d Cir.), which was a patent case with a claim by dealers that the patent could not be enforced because of patent misuse through antitrust violations, the court said:
 
 
 43
 "For these reasons we hold that Louisville (a dealer) is entitled to recover threefold those damages for the period beginning on May 31, 1964 which could not be proved with reasonable certainty in late 1963 (the date of termination of the distributorship)."
 
 
 44
 A similar statement appears in Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117 (5th Cir.), an antitrust action, where the court said:
 
 
 45
 "The authorities cited above establish that continuing antitrust conduct resulting in a continued invasion of a plaintiff's rights may give rise to continually accruing rights of action."
 
 
 46
 The court continued and said in substance that a "newly accruing claim for damages" requires an act occurring within the period.
 
 
 47
 Thus we must hold that the pre-limitation period acts such as the relocation requirement and the Pease requirement, and others, were of such a nature that damages could not have been ascertained until an extended period of time had elapsed. The event which initiated the conditions, that is, the signing of the buy-in agreement or the agreement to the location change requirement, of course, took place at a fixed day and time of day, but the consequences in terms of ascertainable or probable damages under Zenith did not give rise to a cause of action until much later, and within the three-year period. Thus the "action for damages" accrued within the limitation period expressed in the Dealer Act.
 
 
 48
 The judgment of the trial court is in all respects
 
 
 49
 AFFIRMED.
 
 
 50
 McKAY, Circuit Judge, concurring in part, dissenting in part:
 
 
 51
 I concur in the opinion of the court on all issues except one. I disagree with its conclusion that there was sufficient factual evidence to support the jury's determination that Ford Motor Credit Company was not subject to the Automobile Dealer Franchise Act under the circumstances of this case. The Act covers automobile manufacturers, assemblers and any other entity "which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221 (1976). First, in light of the broad remedial purposes of the Act, it is my view that the element of "control" is conclusively established by the showing that Ford Credit is a wholly owned subsidiary of Ford Motor. Second, with the facts presented in this case, Ford Credit's involvement is shown to be exclusively for the purpose of facilitating the distribution of automobiles manufactured by its parent manufacturer and assembler. I do not believe there was any evidence to support a contrary determination by the jury with or without proper instructions.